IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
March 11, 2015 Session

# IN RE NEVEAH W.

**Appeal from the Chancery Court for Shelby County**
**No. CH1407723     Kenny W. Armstrong, Chancellor**



**No. W2014-01531-COA-R10-CV – Filed April 2, 2015**

This extraordinary appeal arises from the trial court's placement of a minor child while the minor child remains in the legal custody of the Tennessee Department of Children's Services ("DCS"). The minor child was removed by DCS from the home of her Foster Parents, who had cared for her almost since birth, after allegations that the Foster Parents had abused one of their other children. The minor child's guardian *ad litem* filed an emergency petition seeking the return of the child to the Foster Parents' home, or alternatively, for an award of legal custody to the Foster Parents. After a hearing wherein DCS, the Foster Parents, and the GAL presented evidence, the trial court ordered that the child be returned to the Foster Parents' home, but declined to remove the child from DCS's legal custody. On appeal, we hold that a trial court may not direct placement of a child in the legal custody of DCS. We reverse the ruling of the trial court and remand for further proceedings.

**Tenn. R. App. P. 10 Extraordinary Appeal; Judgment of the Chancery Court is Reversed and Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the Court, in which BRANDON O. GIBSON, J., and JOHN EVERETT WILLIAMS, Sp. J., joined.

Herbert H. Slatery, III, Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; Alexander S. Rieger and Kathryn A. Baker, Assistant Attorney Generals, for the appellant, Department of Children's Services.

Laura D. Rogers, Memphis, Tennessee, for the appellees, Marie W. and Jason W.

W. Ray Glasgow, Memphis, Tennessee, Guardian Ad Litem.

## OPINION

### Background

This case, an extraordinary appeal pursuant to Tennessee Rule of Appellate Procedure 10, arises from an order of the Shelby County Chancery Court placing a minor child, who is currently in the legal custody of DCS, back into the home of her Foster Parents, with whom she had resided with almost since birth. Neveah W. ("Neveah" or "the child")[1] was born to Stacy W. ("Biological Mother") in May 2011. No father was listed on Neveah's birth certificate.[2] Since birth, Neveah has faced numerous developmental and cognitive obstacles because she was born addicted to certain drugs. The record indicates that Biological Mother had a history of prostitution and drug use; further, she had threatened to kill herself and Neveah at some point while Neveah was still in her custody. Just a few weeks after Neveah's birth, on May 26, 2011, DCS filed a petition in the Shelby County Juvenile Court to adjudicate Neveah dependent and neglected based on allegations that Biological Mother used illegal drugs and had been diagnosed with paranoid schizophrenia, leading her to threaten the lives of herself and Neveah. On June 6, 2011, the trial court awarded DCS temporary custody.

Neveah's initial foster home was unable to care for her special needs. In early June 2011, DCS contacted Marie W. ("Foster Mother") and Jason W. ("Foster Father," together with "Foster Mother," "Foster Parents") to inquire about whether they could provide a foster home for Neveah. Neveah was placed with Foster Parents on June 6, 2011. Foster Parents raised Neveah in their home, undisturbed with the exception of brief visitations from Biological Mother, for approximately three years.

At the time Neveah was placed with the Foster Parents, they had three children, all of whom they had adopted. Foster Parents' children were ages sixteen, thirteen, and nine. Thus, at the time of the hearing in the trial court in this case, three other children resided in Foster Parents home; only one of the children was in foster care, Neveah. Kara, Foster Parents' nine-year-old, had been in Foster Parents' home since she was three years old. Like Neveah, Kara had been placed with the Foster Parents by DCS. However, even from an early age she displayed violent and manipulative behavior. It is undisputed that Kara had been diagnosed with Reactive Attachment Disorder, a condition that caused her to be manipulative and

---

[1] In cases involving minor children, it is the policy of this Court to remove the names of minor children and other parties in order to protect their identities.

[2] The unknown father has not participated in the case at the trial level or on appeal.

oftentimes violent. Kara had been abused, neglected, and sexually molested prior to entering foster care, causing her to act out in sometimes violent and sexual ways. After being taken into custody by DCS, Kara was placed in foster care, but because of her past abuse and Reactive Attachment Disorder, Kara had significant behavioral problems. Accordingly, Kara's stays with foster families were often short-lived. Foster Parents were Kara's fifth foster family in approximately six years. Because Kara moved from foster family to foster family, her inability to attach to a family was compounded. Still, Foster Parents believed they could provide a loving home for Kara and subsequently adopted Kara prior to the events in this case.

During Neveah's time in the care of Foster Parents, DCS made several attempts towards the reunification of Neveah and Biological Mother. The record, including the trial transcript, is not clear on the precise dates of visitations or trial home placements with Biological Mother; however, it is clear that DCS put forth efforts to offer Biological Mother an opportunity to visit with Neveah. Between May 2011 and March 2012, Biological Mother visited with Neveah two times. As of March 2012, the recommended duration and frequency of the visits was four hours every month. On June 6, 2013, DCS attempted a trial home placement with Biological Mother. Sixty days later, the placement was disrupted, and Neveah was returned to Foster Parents. Despite the failure of the first trial home placement, DCS attempted another trial home placement with Biological Mother sometime in late 2013 or early 2014. Again, this trial home placement failed when Biological Mother again returned to a psychiatric treatment facility.

The court-appointed Guardian *ad Litem* ("GAL") filed a Petition to Terminate Biological Mother's Parental Rights in the Shelby County Chancery Court on April 23, 2014.[3] During the pendency of the termination petition, DCS began investigating Foster Parents' home based on allegations of abuse made by Kara. Ultimately, in April 2014, Foster Parents surrendered their rights to Kara, as discussed below, based on her failure to bond with their family due to her Reactive Attachment Disorder. Shortly thereafter, on May 15, 2014, Foster Parents intervened in the GAL's petition to terminate by filing their own Petition to Terminate Biological Mother's Parental Rights and for Adoption under the same docket number. At some point after the filing of the GAL's petition, DCS increased Biological Mother's visitation from four hours per month to four hours per week.

DCS concluded its investigation of Foster Parents' home on July 14, 2014. At that time, DCS removed Neveah from the home and ultimately placed her with a different foster family. DCS also revoked Foster Parents' license to serve as a foster home in the future. DCS based its revocation on Foster Parents' breach of the foster parent contract, which occurred

---

[3] The record indicates that GAL filed his petition at the urging of the Foster Care Review Board.

when Foster Mother conceded she had used corporal punishment on Neveah by "smacking" her hand and when Foster Parents filed their petition to terminate Biological Mother's parental rights. DCS did not provide prior notice to Foster Parents or to Neveah's GAL. That same day, the GAL filed an Emergency *Ex Parte* Petition for Injunctive Relief seeking return of Neveah to the home of Foster Parents. Foster Parents did not file their own emergency *ex parte* motion. On July 15, 2014, counsel for all parties appeared in court. During the hearing, the trial court declined to address the issue of returning Neveah to Foster Parents' home, and it set that matter for hearing on August 11, 2014. The trial court did rule on an issue concerning visitation with Biological Mother, however, entering a written order enjoining DCS from increasing the duration or frequency of the visitations.[4]

On August 11, 2014, the parties appeared for an evidentiary hearing on the GAL's Emergency *Ex Parte* Petition. The following witnesses testified at the hearing: Carolyn Nathaniel, the lead investigator with DCS's Special Investigations Unit; Regina Stigler, a case manager for DCS; Beverly Williams, a case manager for DCS; Tawanna L. Leland, a team coordinator for DCS; Dr. Marwyn Benemerito, Neveah's occupational therapist; and Foster Parents.

The testimony of the witnesses for DCS centered on the investigation into the home of Foster Parents based on the allegations made by Kara. As stated above, DCS's investigation began after Kara made allegations that she had been abused by Foster Parents. Ms. Nathaniel, the lead investigator for DCS, testified that Kara had reported to a third party that she had been locked in her bedroom and forced to urinate and defecate in the room. She also stated that Kara asserted that she had been hit with a wooden spoon. Ms. Nathaniel was unaware of Kara's psychological issues, including her Reactive Attachment Disorder, and had no knowledge of the efforts Foster Parents had made to treat Kara's issues, *see* discussion of Foster Mother's testimony, *supra*. Similarly, Ms. Stigler testified that she had never met Kara, but that she did interview Foster Mother, who revealed to Ms. Stigler that she had locked Kara's door at night only "as a last resort." In addition, Ms. Stigler testified that Neveah reported being hit on the leg. Ms. Stigler did concede that, other than Kara, there was no evidence that Foster Parents had ever locked a child in his or her bedroom.

Like Ms. Stigler, none of the DCS case workers who testified had ever interviewed Kara. However, the DCS employees testified that, before Neveah had been removed, the allegations made by Kara had been "substantiated" pursuant to DCS policy. None of the witnesses for DCS offered an explanation as to the investigative process for substantiating

---

[4] The GAL's petition does not specifically seek this relief, but his petition does include factual allegations that Neveah "has been recently forced to attend visits at the biological mother's home, to which she has reacted with uncontrollable anxiety, sobbing, and pleading not to be forced away from her foster home." The trial court's decision with regard to visitation with Biological Mother is not an issue in this appeal.

abuse allegations made by a young child. However, the DCS employees indicated that it was problematic that Foster Parents had surrendered their rights to Kara and stated that they feared Foster Parents would act similarly toward Neveah, who also displayed psychological issues. Further, the DCS employees testified that Neveah had also reported being hit on the leg, as punishment that is in violation of a DCS internal policy by which Foster Parents agreed to abide pursuant to their contract with DCS.[5] Notably, one DCS witness admitted that, despite DCS's internal "Resource Home Corrective Action Plan," which permits DCS to take corrective steps with Foster Parents, DCS declined to utilize this plan before removing Neveah. Witnesses for DCS testified that DCS did not ever discuss utilizing the "Resource Home Corrective Action Plan" prior to removing Neveah from Foster Parents' home. When questioned by the trial court about their refusal to utilize their own procedures for correcting issues without resorting to the drastic measure of removing the child from her home, the DCS workers gave differing explanations. One witness for DCS said that corrective action was not considered based on the severity of the allegations made by Kara. Another witness for DCS stated that DCS did not take corrective action because the investigation into Foster Parents' home was ongoing. Still another witness for DCS testified that DCS did not take corrective action because it had received enough evidence after the investigation to warrant removal. The DCS employees testified that, after being removed from Foster Parents' home, Neveah had been placed in a prospective adoptive home.

Dr. Marwyn Benemerito, an occupational therapist who treated both Neveah and Kara, testified about the children's psychological issues. According to Dr. Benemerito, Kara's Reactive Attachment Disorder presented a "difficult case," and he explained that children with the disorder are often dishonest and manipulative. Regarding Neveah, Dr. Benemerito testified that, although he had made some progress with her, she began to regress around the same time that DCS increased visits between Neveah and Biological Mother. Dr. Benemerito testified that his office continued to keep a standing appointment time open for her. However, after Neveah had been removed from the Foster Parents' home, DCS did not take Neveah to her occupational therapy appointments, despite her known psychological issues.

Last, Foster Parents testified. Much of their testimony revolved around Kara's allegations. Foster Parents denied that they abused Kara and offered explanations for the methods they used in dealing with Kara's Reactive Attachment Disorder. Both explained that their reason for adopting Kara was to provide her with a loving home; however, Kara was unable to bond with Foster Parents, and her anger increased as she got older. Eventually, Foster Parents testified that they began to fear her and did not know what harm she was capable of inflicting. They stated that Kara often acted violently or inappropriately, such as touching other children, physically abusing family members or the family pet, and

---

[5] The record on appeal does not include the contract between DCS and Foster Parents.

purposefully urinating and defecating in Foster Parents' home. Foster Mother testified that they took numerous steps to help Kara overcome her issues, including play therapy, attachment therapy, occupational therapy, speech therapy, equine therapy, sports, and music. At night, Kara would be afraid, and Foster Mother stated that Kara felt more comfortable with a baby gate across her bedroom door. Still, Kara kept sneaking out of her room at night, causing Foster Parents to be fearful of what she would do. Foster Parents attempted to put an alarm on the gate and bells, but Kara was still able to sneak out. Eventually, Foster Parents began locking Kara's bedroom door at bedtime[6] to prevent her from wandering their home at night unsupervised and hurting herself or the other children, particularly Neveah. Unfortunately, Kara's anger and behavior worsened with age. Eventually, Foster Parents made the decision to surrender their parental rights to her. Foster Mother explained that they found an agency in Murfreesboro that would assist in helping Kara find a new family she would be able to bond with:

> We've never done this before. It's never been on our radar. . . . If we do this, it has to be the perfect family. Kara has a ton of special needs. . . . They found - - they found [a family for Kara]. No, it was not the correct fit for her, based on what they told us. And then they found another family. And I'm telling you, this family was above and beyond everything we had asked for her. . . . And they had been studying for two years, two years, on Reactive Attachment Disorder, because they knew they wanted to go overseas and get a child just Kara's age. . . . This was the perfect family.

Regarding Neveah, Foster Mother admitted that she had tapped Neveah on the hand to stop her from reaching for something, but denied ever being abusive. On the contrary, Foster Father stated:

> I mean, we have been with Neveah for over three years, 24/7, as her mommy and daddy. You know, through them pulling her out of our house for trial visits; comes home after disruption; we're there to pick up the pieces. If she has a rough day with visits, we're there to pick up the pieces. 24/7, we're here to pick up the pieces. And we're sitting on trial for nothing. And it's just - - it's disheartening.

---

[6] Foster Parents indicated that they locked Kara's door for about a month before they surrendered their rights to Kara.

Additionally, Foster Father stated that neither the current foster parent nor DCS has contacted Foster Parents to gather Neveah's clothes or toys or to inquire about Neveah's daily schedule. Foster Parents testified that Neveah was initially upset when she was removed from their home, but DCS later informed them that she had calmed down. Foster Mother stated that they were willing to take complete legal custody of Neveah and be responsible for all of her financial needs.

After hearing the evidence presented at trial, the trial court orally ruled that Neveah would remain in DCS's legal custody, but that she must be returned to the home of Foster Parents by 12:30 p.m. on August 12, 2014. Finding that DCS's removal of Neveah was not in her best interest, the trial court orally found:

> But I really worry about [DCS] taking steps that end up being adverse to the person that you're supposed to be protecting. And I really have a problem with seeing that - - that everything that's been done in this case is for the protection of Neveah. I really have a problem with it. . . . On top of that, I have - - . . . real concerns about, now you're losing a couple, like [Foster Parents], as Foster Parents . . . because of certain findings that have been made, from what I think, without sufficient proof . . . .

DCS requested a stay of the trial court's order, but the request was denied. Accordingly, on August 12, 2014, DCS filed an emergency motion in this Court seeking a stay of the trial court's order pending its extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure.

On August 15, 2014, we granted DCS's motion and stayed the trial court's order. Also on August 15, 2014, DCS filed its application for extraordinary appeal. Finally, the trial court entered its written order on August 29, 2014. The trial court found that, "Upon the filing of the adoption Petition by Foster Parents, this Court obtained exclusive jurisdiction over all matters pertaining to the child pursuant to Tenn. Code Ann. § 36-6-116(f)." Next, the trial court found that DCS's allegations of abuse against Foster Parents were unfounded. The trial court found both Foster Parents and Dr. Benemerito to be credible witnesses. However, the trial court did not make a finding regarding the credibility of any of witnesses testifying on behalf of DCS. The trial court further found that Neveah was not at risk of danger and her removal from Foster Parents' home was not in her best interest. The trial court also specifically found that DCS "has taken steps that are adverse to Neveah's best interests." Ultimately, the trial court ordered that Neveah be placed back in the Foster Parents' home; however, the trial court specifically declined to change legal custody of Neveah to Foster

Parents "at this time."[7]

Shortly thereafter, on September 10, 2014, we granted DCS's application for extraordinary appeal.[8] Our order specifies that our review is limited to the following issue: Does Tennessee Code Annotated Section 37-1-129 authorize a trial court to direct placement of a child within the custody of DCS?

### Discussion[9]

This case involves the interpretation of Tennessee statutes. It presents a question of law, which we review *de novo* with no presumption of correctness. Tenn. R. App. P. 13(d). The Tennessee Supreme Court has outlined the applicable principles that apply to the question of statutory interpretation:

> When dealing with statutory interpretation . . . our primary
> objective is to carry out legislative intent without broadening or
> restricting the statute beyond its intended scope. ***Houghton v.***
> ***Aramark Educ. Res., Inc.***, 90 S.W.3d 676, 678 (Tenn. 2002). In
> construing legislative enactments, we presume that every word

---

[7] During its oral ruling the trial court indicated that he was not ruling on the issue of custody, only placement. The trial court specifically stated, in response to counsel for DCS's query, that Neveah would remain in DCS's legal custody.

[8] Our order entered on August 15, 2014 provides that the trial court's order of August 11, 2014 was temporarily stayed. At that time, the trial court had only orally ruled that Neveah be placed back into the home of Foster Parents. When we granted DCS's application for extraordinary appeal on September 10, 2014, we additionally stayed the trial court's written order entered August 29, 2014, which memorialized its oral ruling of August 11, 2014.

[9] We note that Tennessee law is clear that the Shelby County Chancery Court properly retained jurisdiction in this case. In addition to DCS counsels' concession that the chancery court had jurisdiction over this matter, Tennessee law, specifically Tennessee Code Annotated Section 36-1-116(f)(1) provides: "[U]pon the filing of [a petition for adoption], the court shall have exclusive jurisdiction of all matters pertaining to the child . . . ." Additionally, Tennessee Code Annotated Section 37-1-103(c) provides, in relevant part:

> This subsection (c) does not establish concurrent jurisdiction for any other
> court to hear juvenile cases, but **permits courts exercising domestic**
> **relations jurisdiction to make custody determinations** in accordance with
> this part.

Tenn. Code Ann. § 37-1-103(c)(emphasis added). Chancery courts in Tennessee obtain "jurisdiction, concurrent with the circuit court, of all proceedings for divorce and . . . the adoption for children" by virtue of Tennessee Code Annotated Section 16-11-110.

in a statute has meaning and purpose and should be given full effect if the obvious intention of the General Assembly is not violated by so doing. ***In re C.K.G.***, 173 S.W.3d 714, 722 (Tenn. 2005). When a statute is clear, we apply the plain meaning without complicating the task. ***Eastman Chem. Co. v. Johnson***, 151 S.W.3d 503, 507 (Tenn. 2004). Our obligation is simply to enforce the written language. ***Abels ex rel. Hunt v. Genie Indus., Inc.***, 202 S.W.3d 99, 102 (Tenn. 2006).

***Estate of French v. Stratford House***, 333 S.W.3d 546, 554 (Tenn. 2011). Furthermore, statutes that are part of a broad statutory scheme should be interpreted *in pari materia*, so as to make that scheme consistent in all its parts. ***Wells v. Tenn. Bd. of Regents***, 231 S.W.3d 912, 917 (Tenn. 2007); ***Lyons v. Rasar***, 872 S.W.2d 895, 897 (Tenn. 1994); ***State v. Allman***, 68 S.W.2d 478, 479 (Tenn. 1934). Courts are required to construe a statute, or set of statutes, "so that the component parts are consistent and reasonable." ***In re Sidney J.***, 313 S.W.3d 772, 775 (Tenn. 2010) (quoting ***Cohen v. Cohen***, 937 S.W.2d 823, 827 (Tenn. 1996)). We also have a duty to interpret a statute in a manner that makes no part inoperative. ***In re Sidney J.***, 313 S.W.3d at 775–76 (citing ***Tidwell v. Collins***, 522 S.W.2d 674, 676 (Tenn. 1975)). "Statutes that relate to the same subject matter or have a common purpose must be read *in pari materia* so as to give the intended effect to both." ***In re Kaliyah S.***, --- S.W.3d ---, 2015 WL 273659, at *11 (Tenn. 2015). The issue in this case requires us to compare and harmonize two titles of the Tennessee Code, the juvenile title and the domestic relations title, as they apply in a termination proceeding coupled with an adoption.

The parties rely on two separate and distinct titles from the Tennessee Code to support their respective arguments. DCS argues that Title 37, which contains the statutes concerning juveniles and the authority of DCS, limits the trial court's power over the placement of children who are in DCS custody. Specifically, DCS points to Tennessee Code Annotated Section 37-1-129(e)(1) and (2), which provides:

> (e)(1) Any order of the court that places custody of a child with the department shall empower the department to select any specific residential or treatment placements or programs for the child according to the determination made by the department, its employees, agents or contractors.
> (2) The court may review the residential or treatment placement of a child placed in the department's custody, and within ninety (90) days of the placement, the court may, on its own motion, order a hearing to receive evidence and testimony with regard to the appropriateness of the child's residential or treatment

> placement. . . . The court shall issue a placement recommendation based on a preponderance of the evidence to the department within ten (10) days after the conclusion of the hearing. Upon receiving the court's recommendation, the department shall issue a determination as to the child's placement within fifteen (15) days. . . .

Tenn. Code Ann. § 37-1-129. DCS argues that the plain language in Section 37-1-129(e) empowers DCS, and not the court, to make specific placement decisions for a child within DCS custody. Additionally, DCS contends that the trial court's role is limited to "issu[ing] a placement recommendation," *see* Tenn. Code Ann. § 37-1-129(e)(2), and that the trial court in this matter erred when it purportedly ordered that Neveah be returned to Foster Parents' home—even though the trial court specifically stated that legal custody was to remain with DCS.

Conversely, Foster Parents and the GAL contend that the chancery court's power falls outside the purview of Tennessee Code Annotated Section 37-1-129 when it obtains jurisdiction of a termination proceeding pursuant to Section 36-1-113[10] or an adoption proceeding pursuant to Section 36-1-116.[11] As discussed above, the chancery court here undisputedly obtained jurisdiction when Foster Parents filed their Petition for Adoption. *See* Tenn. Code Ann. § 36-1-116(f)(1). As such, Foster Parents and the GAL assert that the domestic relations statutes found in Title 36 of the Tennessee Code apply, specifically Chapter 1 concerning adoption. Within the domestic relations title of the Tennessee Code, Section 36-1-116(f)(1) provides, in relevant part: "Upon the filing of the [adoption] petition, the court **shall have exclusive jurisdiction of all matters pertaining to the child**. . ." (Emphasis added). Additionally, Section 36-1-116(k)(2)(A) purports to grant a similarly broad power, providing: "Subject to subsection (f), the court may make **any necessary orders** . . . for the protection and welfare of the child." Tenn. Code Ann. § 36-1-116(k). According to Foster Parents and the GAL, Subsection (f)(1)'s use of the phrase "exclusive jurisdiction of all matters pertaining to the child" and Subsection (k)(2)(A)'s use of the phrase "any necessary orders" confers plenary power to the chancery court when it acquires an adoption proceeding coupled with a termination proceeding. They argue that the juvenile statutes cannot restrict the chancery court's exercise of absolute jurisdiction because it "was not the intention of the Legislature that the present and future life of a child should be left to the arbitrary will and possible caprice of anybody, be it the natural parent or any child-caring

---

[10] Tennessee Code Annotated Section 36-1-113 governs the termination of parental rights, including notice requirements and the specific required findings to be made by the court.

[11] Tennessee Code Annotated Section 36-1-116 governs the filing of adoption petitions, including the pre-petition home study, contents of the petition, and the effect of filing an adoption petition.

agency." ***Young v. Smith***, 231 S.W.2d 365, 368 (Tenn. 1950). As such, the GAL and Foster Parents argue that while a juvenile court in a dependency and neglect proceeding may only be entitled to make recommendations to DCS regarding the placement of a child in DCS custody, the adoption statutes give a chancery court presiding over an adoption case far more power to enter orders regarding the child, so long as those orders are in the child's best interest.

With the relevant statutes in mind, we turn to the trial court's order. In its final order returning Neveah to Foster Parents, the trial court agreed with the interpretation of its jurisdiction and power as presented by the GAL and Foster Parents. However, rather than awarding both legal and physical custody to Foster Parents, the trial court's order awards physical custody to Foster Parents, while continuing DCS's legal custody. Upon our review of the relevant statutes, we find the trial court's order problematic. First, the specific statute cited by the trial court for its decision, Tennessee Code Annotated Section 37-1-129(e)(1), states that DCS is empowered, rather than the court, to direct placement of children in its custody. Instead, Tennessee Code Annotated Section 37-1-129(e) specifically limits the trial court's power to merely making a recommendation concerning DCS's placement based on the best interest of the child. *See* Tenn. Code Ann. § 37-1-129(e). The trial court went beyond making a mere recommendation regarding the placement of the child; it entered an order directing DCS to place the child with specific individuals. Clearly, then, the statute cited by the trial court does not support its action in this case.

This conclusion does not end the inquiry, however, as an appellate court is not always bound by the ground relied upon by the trial court in its written order. Indeed, it is well-settled that this Court may affirm a decree of the trial court that is correct in result, although rendered upon different or erroneous grounds. *See* ***Hopkins v. Hopkins***, 572 S.W.2d 639, 641 (Tenn. 1978). Here, the GAL and the Foster Parents argue that the trial court's power to direct the placement of Neveah stems not from Title 37, but from the statutes governing adoption proceedings. Accordingly, we turn to the relevant statutes to determine whether the General Assembly intended that a chancery court presiding over an adoption proceeding would have the power to direct the placement of a child in DCS custody, where juvenile courts presiding over dependency and neglect cases are expressly deprived of such power.

Although both parties champion the application of one statutory title over the other, statutes "must be read in relationship to one another to effectuate the intent of the statutory scheme as a whole." ***Silliman v. City of Memphis***, 449 S.W.3d 440, 460 (Tenn. Ct. App. 2014) (citing 82 C.J.S. *Statutes* § 474). Because both Title 36 and Title 37 concern the same subject matter—the best interests of children—we must construe them *in pari materia*, *See* ***In re Kaliyah S.***, --- S.W.3d ---, 2015 WL 273659 (Tenn. 2015). As our Supreme Court recently explained:

"[T]he construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute." *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010) (quoting *Wilson v. Johnson Cnty.*, 879 S.W.2d 807, 809 (Tenn. 1994)). We seek to adopt the most "reasonable construction which avoids statutory conflict and provides for harmonious operation of the laws." *Carver v. Citizen Utils. Co.*, 954 S.W.2d 34, 35 (Tenn. 1997).

*Kaliyah*, 2015 WL 273659, at *15. Additionally, we must presume that, in enacting the relevant adoption statutes, the legislature is presumed to know both its prior enactments and the state of the law when passing new legislation. *See Dixon v. Holland*, 70 S.W.3d 33, 37 (Tenn. 2002) (citing *State v. Levandowski*, 955 S.W.2d 603, 604 (Tenn. 1997)).

As discussed above, the GAL and Foster Parents argue that the power to direct placement of the child in this case derives not from Title 37, but from the adoption statutes, specifically Tennessee Code Annotated Section 36-1-116(f)(1). Subsection (f)(1) provides that the chancery court, upon the filing of the adoption petition, "shall have exclusive jurisdiction of **all** matters pertaining to the child . . . ." (emphasis added). Additionally, Subsection (k)(2)(A) purports to allow the trial court to enter "any necessary orders . . . for the protection and welfare of the child." As stated above, Foster Parents and the GAL assert that this provision confers upon the chancery court the right to direct the placement of a child. We respectfully conclude that their suggested interpretation relies on an overly broad interpretation of this provision.

The GAL and Foster Parents' interpretation seemingly requests this Court to discount the specific provisions of the juvenile statutes. This we cannot do. As previously discussed, the above language from Title 36 may not be read in a vacuum, but must be considered in conjunction with the provisions of Title 37 relating to the same subject matter. Accordingly, we must consider both the relevant provisions of Title 36 and Title 37 to determine this issue. Considering both the specific limitation on the court's power to direct the placement of a child in DCS custody in Title 37 and the broad grant of power established in Title 36, we must conclude that the limitation expressed in Title 37 is controlling in this situation.

A well-settled canon of statutory interpretation provides that specific statutory provisions control over conflicting general provisions. *Arnwine v. Union Cnty. Bd. of Educ.*, 120 S.W.3d 804, 809 (Tenn. 2003). As such, the specific provisions of the juvenile statutes serve as a limitation to a trial court's exercising jurisdiction in termination cases coupled with adoption proceedings where DCS remains the legal custodian of the child. While the adoption statute confers "exclusive jurisdiction" upon the trial court to preside over all

12

matters related to the child at issue, the trial court's order must still comport with the juvenile statutes relating to the trial court's power to direct placement of a child in DCS custody pursuant to the doctrine of *in pari materia. See **In re Kaliyah S.**,* 2015 WL 273659, at \*15.

From our review of the relevant statutes, nothing in the adoption statutes confers any additional power on the chancery court to direct placement of a child in DCS custody, while a juvenile court is merely allowed to make recommendations in a similar situation. Clearly, in both the adoption context and the dependency and neglect context contemplated in Title 37, the paramount consideration is the best interests of the child. *See* Tenn. Code Ann. § 37-1-101 *et seq.* Thus, these statutes must be construed so as to give effect to all their terms. **Silliman v. City of Memphis**, 449 S.W.3d at 460. To grant the chancery court a superior power over a juvenile court to direct the placement of a child in DCS custody simply because an adoption petition has been filed giving the chancery court jurisdiction does not comport with the well-settled doctrine of *in pari materia. See **In re Kaliyah S.**,* 2015 WL 273659, at \*11. We decline to conclude that our interpretation of the statutes at issue would vary depending on which court is exercising jurisdiction.

Furthermore, we reject the GAL's and the Foster Parents' assertion that vesting the chancery court with exclusive jurisdiction over adoption proceedings permits the chancery court unbounded power to enter orders concerning the child, where the General Assembly has indicated that such action is beyond the court's power. Black's Law Dictionary defines "subject matter jurisdiction" as "[j]urisdiction over the nature of the case and the type of relief sought." *Black's Law Dictionary* 931 (9th ed. 2009). In contrast, "power" is defined as "[t]he legal right or authorization to act or not to act[.]" *Black's Law Dictionary* 1288 (9th ed. 2009). Thus, while a court may have broad jurisdiction over a case or controversy, the court's orders must still comply with all applicable laws on the issue. If this were not the case, no court properly exercising jurisdiction could ever err in its exercise of power. Here, Tennessee Code Annotated Section 37-1-129(e) expressly limits the court's power to direct the placement of a child in DCS custody.[12] Nothing in the broad grant of jurisdiction to the chancery court exempts the chancery court from this limitation on the court's power. Accordingly, we must reverse the order of the chancery court directing the placement of

---

[12] Nothing in this Opinion should be construed as precluding or limiting a trial court's power to change a minor child's legal custody pursuant to Tennessee Code Annotated Section 36-1-116(f)(3) (permitting a court presiding over an adoption to enter an order vesting legal custody or guardianship with pre-adoptive parents). At various points in these proceedings, all parties have recognized that the trial court maintains the power to award legal custody of a child to pre-adoptive parents like the Foster Parents in this case. While the GAL and Foster Parents requested this relief in the trial court, the trial court declined to grant their request. Whether the trial court erred in refusing to change custody of the child to Foster Parents was not designated as an issue in this extraordinary appeal.

13

Neveah while she remains in the legal custody of DCS.

## Conclusion

The judgment of the Shelby County Chancery Court is reversed and remanded to the trial court for further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are taxed to the Appellees, Marie W. and Jason W., for all of which execution may issue if necessary.

_____
J STEVEN STAFFORD, JUDGE