FILED

02/03/2017

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 17, 2016 Session

## IN RE:  NEVEAH W.

Direct Appeal from the Chancery Court for Shelby County
No. CH-14-0772, CH-14-0651    Walter L. Evans, Chancellor

No. W2016-00932-COA-R3-PT

This is the second appeal in this case involving a long-running battle between foster parents and the Tennessee Department of Children's Services ("DCS"). In 2014, DCS removed the three-year-old child at issue from her foster home of three years. In the context of this already pending termination and adoption proceeding, the chancery court held an evidentiary hearing and determined that there was insufficient evidence to justify removal and that DCS had taken steps adverse to the child's best interest. The chancery court ordered DCS to return the child to her foster home. On extraordinary appeal, this Court determined that a trial court cannot direct the placement of a foster child within DCS legal custody, but we recognized that the trial court could remove legal custody from DCS and place custody directly with the foster parents if warranted. One week prior to the hearing on remand, DCS participated in a surrender proceeding under a separate docket number and contemporaneously obtained an order of full guardianship over the child. DCS then moved to dismiss as moot the termination, adoption, and custody petitions pending in this case because DCS, as guardian, refused to consent to an adoption by the child's former foster parents. The child's current foster mother attempted to intervene. After a two-day trial, the trial court dismissed the former foster parents' petitions as moot and granted the adoption to the current foster mother, as DCS in its role as guardian would only consent to an adoption by her. The child's guardian ad litem appeals. The former foster parents and DCS raise additional issues. We affirm in part, vacate in part, reverse in part, and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
in part, Vacated in part, Reversed in part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN, J., and DAVID R. FARMER, SP. J., joined.

William Ray Glasgow, Memphis, Tennessee, Guardian ad Litem for the Appellant, Neveah W.

Herbert H. Slatery III, Attorney General and Reporter, Andrée S. Blumstein, Solicitor General, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the Appellee, Tennessee Department of Children's Services.

Laura Diane Rogers, Memphis, Tennessee, for the Appellees, Jason W. and Marie W.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

The child at issue in this proceeding, Neveah, was born in May 2011. DCS received a referral regarding Neveah on the date of her birth. Neveah's mother ("Mother") was a psychiatric patient with a history of severe mental illness and diagnosis of paranoid schizophrenia. She was hospitalized while pregnant due to suicidal and/or homicidal ideations. After birth, Mother reportedly stated that she wanted to kill herself and Neveah. She had an arrest history of prostitution and was unable to give the name of Neveah's father. Neveah remained hospitalized after birth due to withdrawal symptoms from unknown medications. The juvenile court of Shelby County awarded temporary custody of Neveah to DCS pursuant to a protective custody order on or about May 26, 2011.

Neveah was discharged from the neonatal intensive care unit and placed in a foster home with Jason and Marie W. ("Foster Parents") when she was four weeks old. Foster Parents were military veterans who had served as foster parents in Virginia and adopted three children before relocating to Tennessee. They had fostered a total of six children in Virginia and Tennessee and welcomed Neveah into their home. In October 2011, Neveah was adjudicated dependent and neglected, "as one whose parent . . . by reason of cruelty, mental incapacity, immorality or depravity is unfit to properly care for such child." The dependency and neglect order provided that legal custody would remain with DCS.

One of the adopted children in Foster Parents' home, Kara, suffered from Reactive Attachment Disorder. According to a therapist who testified in this case, one behavioral manifestation of Reactive Attachment Disorder is that the person is very manipulative and dishonest. Kara had been abused, neglected, and molested, and she was originally placed in foster care at the age of two. By the time she was placed with Foster Parents at the age of three, she had already been removed from four foster homes due to outrageous behavior and attended 150 medical visits. Foster Parents believed that if they provided Kara with a safe and loving home, she would eventually accept them. They adopted Kara at the age of six. They enrolled her in play therapy, attachment therapy, occupational

therapy, speech therapy, equine therapy, sports programs, and music lessons, but nothing seemed to help Kara. She attempted to harm Foster Parents' dog, tried to molest other children on the playground, tried to bite opposing team members during soccer, and struck Foster Father more than once. According to Foster Parents, the older Kara grew, the angrier she became. Kara was manipulative and violent. During therapy and at other times, she would state that she wanted to "rip off your head and pee down your throat." She would intentionally urinate and defecate in her bedroom. She would go into fits of rage for hours during the day and sneak out of her bedroom at night. Foster Parents began to fear Kara, who was nine years old by then, and began working with a private adoption agency to find another adoptive family for her. Foster Parents did not inform DCS of their issues with Kara or their intent to surrender their parental rights to her because Kara was not a DCS foster child; instead, they sought assistance from the department that placed Kara.[1]

As Kara's behavior escalated, Foster Parents placed baby gates, bells, and alarms on Kara's bedroom door, but she continued to leave her room at night. They also placed an alarm on Neveah's door in case Kara attempted to enter her room at night. Eventually, Foster Parents began locking Kara's door at night. This practice lasted for about one month until Foster Parents surrendered their parental rights to her on April 2, 2014. Kara went to a family with a special education teacher who had studied reactive attachment disorder.

In the meantime, between 2011 and 2014, DCS made significant efforts to reunite Neveah with Mother despite Mother's severe mental health issues. DCS scheduled a ninety-day home visit for Neveah with Mother, but after about two months, Mother voluntarily ended the visit by reporting through the DCS safety plan that she could not bear the child. The foster care review board recommended termination of Mother's parental rights. Frustrated by DCS's failure to proceed, Neveah's guardian ad litem ("GAL") filed a petition to terminate Mother's parental rights in the chancery court of Shelby County on April 23, 2014, just before Neveah's third birthday. The petition alleged that termination was appropriate based on the statutory grounds of substantial noncompliance with permanency plans, persistent conditions, and parental incompetence because of Mother's impaired mental condition. The petition alleged that termination was in Neveah's best interest and that Foster Parents were willing to adopt her.

About three weeks later, on May 15, 2014, Foster Parents filed a separate petition for termination and adoption, also in the chancery court of Shelby County. They alleged abandonment, in addition to the same grounds for termination asserted by the GAL. Foster Parents' adoption petition noted that they had cared for three-year-old Neveah

---

[1]Although the record is not entirely clear regarding the department that placed Kara, we infer from the record that the Foster Parents' adoption of Kara was accomplished through a DCS equivalent in Virginia.

almost continuously since she was discharged from the hospital at one month old. The two petitions were eventually consolidated.

DCS considered Foster Parents' decision to independently file a petition for adoption as a breach of their foster parent agreement with DCS. DCS considered but ultimately decided against removing Neveah from Foster Parents' home based on their filing of the adoption petition on May 15, 2014. However, the relationship between DCS and Foster Parents continued to deteriorate. On May 19, 2014, Foster Parents and the GAL jointly filed a petition for injunctive relief, alleging that DCS was allowing Mother to have unsupervised contact with Neveah despite Mother's recent involuntary commitments, hallucinations, and assault on her mother. Chancellor Kenny Armstrong[2] entered an injunction prohibiting Mother from having any unsupervised contact with the child pending further orders. The day after this injunction was entered, DCS increased Mother's supervised visitation from four hours per month to four hours per week. Chancellor Armstrong later ruled that DCS could not further increase Mother's visitation without a hearing.

On June 23, 2014, DCS learned of statements made by Kara indicating that she had been locked in her bedroom at Foster Parents' home and that she had urinated and defecated in her room. DCS employees went to Foster Parents' home and interviewed them about the situation. Foster Parents told DCS about Kara's Reactive Attachment Disorder and behavioral issues and their previous attempts at counseling, baby gates, and door alarms. Foster Parents said that they used a wooden spoon when spanking Kara but that they did not do the same with Neveah, as DCS policies prohibited corporal punishment for foster children. They admitted to locking Kara's bedroom door at night as "a last resort" for the last month that she was in their home due to their concerns about the safety of other family members and the pets. Foster Parents also explained Kara's practice of urinating and defecating in her bedroom.

DCS admittedly never had any issues with the care Foster Parents provided to Neveah prior to this incident, and they did not observe anything alarming about Neveah's condition during their visit to Foster Parents' home to investigate. Foster Parents' two older children (ages sixteen and thirteen) were interviewed and reported that they had never been locked in their rooms. Still, DCS considered locking Kara in her bedroom at night to constitute abuse.

On July 14, 2014, DCS removed Neveah from Foster Parents' home without prior notice to Foster Parents, the GAL, or the trial court. Neveah was placed in a new foster home with a single parent who had never fostered any children. Foster Parents were not

---

[2]Effective September 1, 2014, Chancellor Kenny Armstrong became a Judge of the Tennessee Court of Appeals.

allowed to visit Neveah or have any contact with her whatsoever after the removal. DCS discontinued Neveah's weekly appointments with an occupational therapist and did not provide her with any other therapy. The GAL filed an emergency petition for injunctive relief seeking an order requiring DCS to return Neveah to Foster Parents' home. At a hearing the next day, DCS conceded that it removed Neveah from Foster Parents' home based solely on the fact that Foster Parents locked Kara in her room.[3] DCS acknowledged that Kara "absolutely" had "issues." However, DCS insisted that it could remove a foster child from a foster parent for any reason or no reason at all, without consulting a guardian ad litem. DCS argued that it had absolute discretion over the placement of foster children that could not be interrupted by a court order. Despite this argument, the trial court scheduled a hearing to review the placement decision.

Prior to the hearing, the GAL filed a motion to modify custody seeking to have custody completely removed from DCS and awarded directly to Foster Parents. DCS also filed its own intervening petition to terminate Mother's parental rights on the grounds of persistent conditions and parental incompetence. The termination petition filed by DCS alleged that it was in Neveah's best interest for the trial court to place her in the full guardianship of DCS, granting it the right to consent to any adoption.[4]

Chancellor Armstrong held an evidentiary hearing on August 11, 2014, to consider the GAL's emergency petition for return of Neveah to Foster Parents' home. At that time, Neveah had been removed from the home for less than a month. Chancellor Armstrong clarified at the beginning of the hearing that because of the already pending termination petitions, "we're going to be talking about placement; . . . not the removal of legal custody of the Department, but placement in the interim." Seven witnesses testified, including Foster Parents, Neveah's occupational therapist, and four DCS employees.

The trial court ultimately concluded that the allegation that Kara was abused by Foster Parents was not supported by the evidence. The trial court found that the DCS employees who testified had never met Kara and had little if any knowledge of her

---

[3]Neveah reportedly stated during the investigation that her foster mother hit her on the leg. Foster Parents denied spanking Neveah. DCS did not necessarily consider spanking Neveah to be child abuse but did consider it to be a violation of the foster care contract. However, DCS admitted that it removed Neveah solely because Foster Parents locked Kara in her room. Counsel for DCS said, "There were additional allegations that involved her including some corporal punishment . . . which is another violation of the foster care parents' contract. But is not why we removed the child. We removed the child because of the serious concerns of the locking in the room."

[4]By statute, DCS was "permitted to assert its rights to custody or guardianship of the child" in the termination proceeding. Tenn. Code Ann. § 36-1-117(e). DCS also had "the right to intervene in the adoption proceeding at any time to present evidence as to the best interests of the child by filing a sworn complaint in the adoption proceeding." Tenn. Code Ann. § 36-1-116(k)(1).

mental health history or behavior that led Foster Parents to lock her bedroom door at night. The trial court found Foster Parents "very credible." It found that they did their best to provide Kara with a loving home but that Kara engaged in inappropriate behavior such as inappropriately touching other children, being physically abusive to family members, intentionally urinating and defecating in the home, and hurting the family pet. The trial court noted Foster Parents' acknowledgement that they were forced to lock Kara's door at night as a last resort for a short period of time because they were afraid that she would hurt the other children in the home, and other attempted measures had been unsuccessful.

The trial court also found the allegation that Neveah may have been abused by Foster Parents to be unsupported by the evidence. The trial court noted the foster mother's admission that she had "slapped at Neveah's hand" when reaching for an object, and, the court added, she "demonstrated for the Court a light pat," but she denied otherwise hitting or spanking Neveah.

In conclusion, Chancellor Armstrong concluded that the evidence did not support DCS's removal of Neveah from Foster Parents' home, where she resided from June 2011 to July 2014. The court found that Neveah was not at risk of harm and that removal from Foster Parents' home was not in Neveah's best interest. The court added, "The Department has taken steps that are adverse to Neveah's best interests."

The trial court denied DCS's oral request for a stay pending an interlocutory appeal. Chancellor Armstrong ordered that Neveah be immediately returned to Foster Parents' home the following day, no later than 12:30 p.m. on August 12, 2014. He clarified that he was not removing legal custody from DCS, adding, "I just did placement for today." In the written order, entered August 29, 2014, the court noted that Foster Parents and the GAL had argued that legal custody should be removed from DCS and awarded directly to Foster Parents, but the order stated that "[t]he Court declines to decide that issue at this time."

Pursuant to Chancellor Armstrong's oral ruling, Neveah returned to Foster Parents' home on or about August 12, 2014. However, DCS filed an application for an extraordinary appeal to this Court pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure and also sought an emergency stay of the trial court's order. On August 15, 2014, this Court granted DCS's motion and stayed the trial court's order. DCS employees then went to Foster Parents' home and removed Neveah a second time. On September 10, 2014, we granted DCS's application for an extraordinary appeal to decide the single issue of whether a trial court is authorized to direct the placement of a child within the custody of DCS. On April 2, 2015, this Court issued an opinion answering that question in the negative. *See In re Neveah W.*, 470 S.W.3d 807, 808

6

(Tenn. Ct. App. 2015) ("we hold that a trial court may not direct placement of a child in the legal custody of DCS"). We noted, however, that all parties to the case recognized that the trial court maintained the power to award legal custody of a child to pre-adoptive parents like Foster Parents. *Id.* at 818 n.12. We recognized that the GAL and Foster Parents requested such relief in the trial court and that the trial court had declined to grant their request at that time. *Id.* Whether the trial court erred in that particular decision was not designated as an issue in the extraordinary appeal, and we noted that our opinion should not be construed as precluding such relief. *Id.*

By the time of our opinion, eight months had passed since DCS initially removed Neveah from Foster Parents' home. Back in the trial court, the GAL set for hearing his previously filed petition to have legal custody removed from DCS and awarded directly to Foster Parents, which Chancellor Armstrong specifically declined to resolve at the evidentiary hearing. The custody hearing was set for May 8, 2015, to be heard by Chancellor Walter Evans, as Chancellor Armstrong had by that time been appointed to the Tennessee Court of Appeals. Prior to the May 8 custody hearing, DCS moved to have the custody matter heard at the same time as the pending termination petitions. However, DCS suggested that its expert witnesses might not be ready by May 8. Foster Parents opposed any further delay of the custody hearing and pleaded for the earliest possible hearing date, suggesting that the court hear all of the pending matters at the upcoming May 8 hearing. The trial court ruled that the custody and termination petitions would be heard together in one hearing on May 18, 2015.

On May 11, 2015, DCS and Mother appeared before Chancellor Evans in a surrender proceeding under a separate docket number from the pending proceeding involving custody, termination, and adoption. In the separate surrender proceeding, Mother executed a surrender of her parental rights to Neveah to DCS. DCS filed a "Motion for Order of Full Guardianship" and obtained an "Order of Full Guardianship" on the same date. Neither the GAL nor Foster Parents were given notice of the surrender, the motion for order of guardianship, or the order of full guardianship. DCS's motion for guardianship recited that DCS had obtained custody of Neveah in 2011 shortly after her birth and that she had remained in its care since that time. However, it did not mention the pending custody, termination, and adoption petitions under the separate docket number or the hearing that was scheduled for one week later regarding whether Neveah should be removed from DCS custody. Chancellor Evans entered the order granting DCS full guardianship of Neveah thereby entitling it "to provide care, supervision, and protection of said child" and "to place said child for adoption with prospective adoptive parents and to consent to the adoption of the child by those prospective adoptive parents."

On May 18, 2015, counsel for DCS appeared at the previously scheduled custody and termination hearing with the surrender documents and order of guardianship and

provided them, for the first time, to Foster Parents and the GAL. DCS immediately filed a notice of voluntary dismissal of its pending petition to terminate Mother's parental rights and filed a motion to dismiss the termination petitions filed by the GAL and Foster Parents as moot. At the same time, DCS filed a motion to dismiss Foster Parents' adoption petition, asserting that the May 11 order of guardianship gave it sole authority to place Neveah for adoption and consent to her adoption and that it would not consent to an adoption by Foster Parents.[5] DCS insisted that the order of guardianship was a final order and irrevocable. It also filed a motion to dismiss the GAL's petition to have custody removed from DCS on the basis that its order of guardianship superseded custody orders.

We do not have a transcript of the May 18, 2015 hearing, but it appears that the trial judge indicated his intention to adopt the factual findings made by Chancellor Armstrong from the August 11, 2014 hearing and award legal custody of Neveah to Foster Parents without hearing additional evidence. Prior to the entry of a written order to this effect, DCS filed a motion for reconsideration, a motion to clarify order, and a notice of objections to proposed order.

At a subsequent hearing on May 28, 2015, DCS continued to insist that its order of guardianship trumped any custody matters and rendered all pending petitions in this case moot, including Foster Parents' adoption petition, because DCS refused to consent to an adoption by Foster Parents. The GAL questioned whether DCS had authority to seek guardianship due to the existence of the petitions that were already pending in this case. The trial court ruled that it would "stay any movement" of Neveah because the mandate had not yet issued from this Court. However, over DCS's objection, the trial court permitted Foster Parents to have visitation with Neveah pending further orders. On June 29, 2015, the trial court entered an order staying the proceedings "other than visitation and hearing for disposition of custody petition."

---

[5]An award of only legal custody "vest[s] the legal custodian with the authority to provide the care and control of the child . . . but does not, by itself, without entry of an order of guardianship . . . authorize the legal custodian to place the child for adoption or to consent to the adoption." Tenn. Code Ann. § 36-1-118(e)(8). In contrast, complete guardianship permits the guardian entity to place the child for adoption and consent to adoption. Tenn. Code Ann. § 36-1-102(25)(C)(ii). This statute grants the guardian "the exclusive authority to place the child for adoption and to consent to the adoption, and confers no authority on the trial court to interfere with the guardian's exclusive authority." *In re E.M., II*, No. W2006-00663-COA-R3-CV, 2006 WL 3007511, at *2 (Tenn. Ct. App. Oct. 24, 2006). Thus, when guardianship has been granted to DCS or any other party, "the guardianship carries certain rights that must be dealt with before another party can adopt the child." *In re Don Juan J.H.*, No. E2010-01799-COA-R3-JV, 2011 WL 8201843, at *3 (Tenn. Ct. App. Sept. 7, 2011). "When the department . . . is the guardian of the child, its rights must be terminated by court action or it must provide consent . . . before an adoption can be ordered." Tenn. Code Ann. § 36-1-102(24)(D).

Neveah began having supervised visits with Foster Parents in July 2015. Neveah had not seen or spoken to Foster Parents in approximately ten months. She ran to Foster Parents and their two children, referred to Marie as "mom," and asked repeatedly if she could return home. Neveah had eight or nine supervised visits with Foster Parents during the proceedings below and asked to go home during every visit.

Despite the trial court's initial ruling regarding the conclusiveness of Chancellor Armstrong's factual findings, the case was ultimately set for an additional evidentiary hearing to be held on August 11, 2015. However, on August 11, Neveah's current foster mother, Tammy D. ("Current Foster Mother"), filed an "intervening memorandum in support of motion to dismiss" urging the trial court to grant DCS's motion to dismiss the custody petition. The intervening memorandum stated, "Subject to the Court[']s approval, [Current Foster Mother] respectfully asks this Court to allow her to intervene in the instant proceedings and as grounds for her request she provides the following background information." She stated that she was Neveah's current foster mother and had been so since Neveah was removed from Jason and Marie's home about thirteen months earlier. Current Foster Mother's intervening memorandum stated that she had filed an "Intervening Petition for Adoption" on August 7, 2015, but, as will be discussed later in this opinion, the intervening petition for adoption was not actually filed by the chancery court clerk. Current Foster Mother did not file a motion to intervene, and no order was entered allowing her to intervene in the proceedings.

The evidentiary hearing was continued and eventually held on November 17 and 18, 2015, for consideration of the custody petition, parental termination petitions, and adoption petitions. By this time, Neveah was four years old. At the beginning of the hearing, DCS argued its pending motions to dismiss. DCS asserted that the trial court should only consider Current Foster Mother's adoption petition and should dismiss the other petitions as moot due to DCS having obtained the order of guardianship with the right to consent to any adoption. Foster Parents and the GAL acknowledged that the trial court had jurisdiction to accept a surrender of parental rights from Mother, but they argued that the trial court should not have ruled on the issue of guardianship without any notice being provided to them and without consideration of Foster Parents' pending petition for adoption and the pending petition for custody to be removed from DCS. Counsel for Current Foster Mother addressed the court as well and asserted that her adoption petition was entitled to preference because she had been Neveah's foster parent for over a year.[6] The trial judge ultimately ruled that he would hear the proof on both of

---

[6]Tennessee Code Annotated section 36-1-115(g)(1) provides:

> When a child is placed in a foster home by the department or otherwise, and becomes available for adoption due to the termination or surrender of all parental or guardianship rights to the child, those foster parents shall be given first

the competing adoption petitions and "see where we go from there."

Over the course of two days, the trial court heard testimony from the counselor who had been observing Foster Parents' supervised visits with Neveah, a psychologist who performed "a very basic evaluation" of Neveah, the occupational therapist who treated Neveah prior to her removal from Foster Parents' home, Foster Parents, two family friends of Foster Parents, Current Foster Mother, and a DCS foster care worker. On the second day of trial, Foster Parents filed a written motion to set aside or vacate the order of guardianship. At the conclusion of the testimony, the trial judge requested proposed findings and took the matter under advisement.

On March 30, 2016, the trial court entered its findings of fact, conclusions of law, and final order. The trial court noted that Neveah's biological mother "surrendered all her parental rights to Neveah [] on May 11, 2015 before Chancellor Evans who signed and entered an order granting full guardianship to the Department." The trial court found that "[a]ll persons entitled to notice of the proceedings ha[d] been served with process and . . . all necessary parties were properly before the Court." The trial court found that "the Department followed proper procedure for the surrender" because the surrender statute only allows limited persons to be present and requires that surrenders occur under a separate docket number. Accordingly, the court concluded that the GAL and Foster Parents were not proper parties to the surrender action. The trial court also dismissed the termination petitions as moot due to the surrender.

Next, the trial court concluded that the order of guardianship could not be attacked more than thirty days after its entry pursuant to Tennessee Code Annotated section 36-1-112(d). The trial court also concluded that the GAL and Foster Parents had no standing to challenge the order of full guardianship, reasoning that a litigant is barred from raising another person's legal rights. Accordingly, the court declined to set aside or vacate the order of guardianship.

The trial court dismissed the petition seeking to remove custody from DCS as moot based on the order of guardianship. It also found that "[t]he only way [Foster Parents] can adopt is if the Department's guardianship is terminated or the Department consents to them adopting Neveah, neither of which has occurred." The court also found

---

preference to adopt the child if the child has resided in the foster home for twelve (12) or more consecutive months immediately preceding the filing of an adoption petition.

However, this statutory "preference is not conclusive." *In re Adoption of A.K.S.R.*, 71 S.W.3d 715, 718 (Tenn. Ct. App. 2001).

that Foster Parents did not have physical custody of Neveah or the right to receive custody, so they could not prevail on an adoption petition.

The trial court found that DCS did consent to Current Foster Mother adopting Neveah and that Current Foster Mother had a legal preference due to the fact that she had maintained custody of Neveah for more than a year. *See* Tenn. 36-1-115(g)(1). The court found that Neveah was doing well in her current foster home and that adoption was in her best interest. Accordingly, the trial court granted Current Foster Mother's petition for adoption. The GAL timely filed a notice of appeal on April 28, 2016.

Upon transmission of the record to this Court, the parties discovered that Current Foster Mother's "Intervening Petition for Adoption" was not included in the record because it was not accepted for filing by the trial court clerk. On August 19, 2016, Current Foster Mother filed in the trial court a "Motion to Correct the Record and to Allow [her] to Intervene as a Petitioner nunc pro tunc." On September 19, 2016, the chancery court entered an order granting Current Foster Mother's motion for leave to intervene nunc pro tunc and designating her pleadings as "properly includable" in the appellate record.

## II. ISSUES PRESENTED

The GAL presents the following issues for review on appeal:

1. Whether a Guardian ad Litem appointed to represent a child under Tennessee Supreme Court Rules 13 and 40 is entitled to notice:

   (a) when placement of a foster child in the custody of [DCS] is changed or modified;

   (b) of court hearing upon filing with the court for emergency removal by [DCS]; or

   (c) when a Motion for Full Guardianship has been filed by [DCS] of a child in foster care represented by a Guardian ad Litem;

2. Whether the trial court erred in ignoring an order of a previous chancery court ruling on the same parties and issues without an offer of proof from [DCS] challenging the previous findings of fact and conclusions of law set forth in the previous order.

In their posture as appellees, Foster Parents raise the following additional issues:

3.      Whether Tennessee Code Annotated section 37-1-129 limits an adoption court's authority to make decisions for the child's best interest including ordering [DCS] to return children to their foster home after a full hearing;

4.      Whether the trial court erred in granting leave to [Current Foster Mother] to intervene in the custody proceeding;

5.      Whether the trial court erred in denying [Foster Parents'] Petition for Adoption;

6.      Whether the trial court erred in awarding full guardianship to [DCS] ex parte and in failing to set it aside;

7.      Whether the trial court erred in granting [Current Foster Mother's] motion to intervene retroactively and ordering pleadings to be included in the appellate record nunc pro tunc that had been refused by the clerk of court without permission from this Court;

8.      Whether the trial court erred in denying the Guardian Ad Litem's Petition to remove custody from [DCS].

DCS raises an additional issue:

9.      Whether the trial court properly dismissed the Guardian Ad Litem's petition for custody as moot.

For the following reasons, we affirm in part, vacate in part, reverse and remand for further proceedings.


### III. DISCUSSION

### A.    The Foster Care Placement Decision

At the outset, we address Foster Parents' issue regarding whether Tennessee Code Annotated section 37-1-129 limits an adoption court's authority to return a child to a particular foster home. They argue that Chancellor Armstrong was within his authority to order Neveah returned to her foster home in August 2014. Foster Parents acknowledge

that this Court has already agreed with DCS's interpretation of the statute in our opinion entered in the context of the Rule 10 extraordinary appeal. *See In re Neveah*, 470 S.W.3d at 818 ("Tennessee Code Annotated Section 37-1-129(e) expressly limits the court's power to direct the placement of a child in DCS custody"). However, they suggest that this Court's ruling was erroneous and places trial courts in a difficult position.

"The law of the case doctrine 'generally prohibits reconsideration of issues that have already been decided in a prior appeal of *the same case.*'" *In re Bridgestone/Firestone*, 495 S.W.3d 257, 266 (Tenn. Ct. App. 2015) (quoting *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998)). In other words, a court will generally refuse to reconsider an issue that has already been decided by the same court in the same case. *Id.* (quoting 36 C.J.S. *Federal Courts* § 602 (2015)). This discretionary rule of judicial practice is based on the common sense recognition that issues previously litigated and decided need not be revisited. *Id.* An appellate court's decision on an issue of law will be binding in later appeals of the same case if the facts on the subsequent appeal are substantially the same as those in the first appeal. *Id.* However, a redetermination of a previously decided issue may be justified (1) when the evidence offered following remand is substantially different from the evidence in the earlier proceeding; (2) when the prior decision was clearly erroneous and would result in manifest injustice if allowed to stand; or (3) when the prior decision is contrary to a change in the controlling law which occurred between the first and second appeal. *Id.* Foster Parents have not demonstrated that any of these grounds exist. We have already considered and rejected Foster Parents' interpretation of this particular statute in the previous appeal and decline to re-analyze the issue in this subsequent appeal of the same case.

### B.    *Notice of the Change in Placement*

Next, we address the GAL's argument that a guardian ad litem should be entitled to prior notice when placement of a child in DCS foster care is changed or modified. Again, we find our previous opinion in this case instructive. In *In re Neveah*, 470 S.W.3d at 808, we held that a trial court may not direct placement of a child in the legal custody of DCS. Based on the applicable statutes, we concluded that "DCS is empowered, rather than the court, to direct placement of children in its custody." *Id.* at 816. Given this "specific limitation on *the court's* power to direct the placement of a child in DCS custody," *id.* at 817 (emphasis added), we discern no basis for requiring DCS to notify *a guardian ad litem* prior to changing or modifying a foster care arrangement. The statutes and rules cited by the GAL on appeal simply do not require that DCS provide prior notice to a guardian ad litem when foster placement is modified. Although notice to the guardian ad litem might be desirable, we find no other authority for imposing a mandatory notice requirement on DCS.

The GAL correctly notes that a guardian ad litem represents the best interest of a child, and he suggests that he was unable to do so without notice of the change in foster care placement. However, Neveah was removed from Foster Parents' home on July 14, 2014, due to DCS's ongoing investigation into possible abuse of Kara. The GAL filed an emergency petition for injunctive relief, seeking Neveah's return to Foster Parents' foster home, on that same date. Thus, the GAL was able to file a petition on Neveah's behalf and advocate for her best interest in a timely manner. He does not suggest what additional action he would have taken if he had learned of the impending removal before it occurred. The fact remains that the GAL was not empowered to veto DCS's foster care placement decision under the facts of this case and our holding in *In re Neveah*. "DCS is empowered . . . to direct placement of children in its custody." *Id.* at 816.

The record demonstrates no reversible error with regard to this issue.

### C.    *Holding an Additional Evidentiary Hearing*

Next, we consider the GAL's issue regarding "[w]hether the trial court erred in ignoring an order of a previous chancery court ruling on the same parties and issues without an offer of proof from [DCS] challenging the previous findings of fact and conclusions of law set forth in the previous order." The GAL claims that "the previously entered findings of fact and conclusions of law [by Chancellor Armstrong] were binding on the trial court." Foster Parents likewise argue that Chancellor Armstrong's findings from 2014 "should have been conclusive on the issue of Neveah's return to [Foster Parents] and removal of custody from the Department."

As noted above, Chancellor Evans initially indicated his intention to return custody to Foster Parents based solely on Chancellor Armstrong's findings. He entered an order stating that Chancellor Armstrong's factual findings from the August 11, 2014 evidentiary hearing were not challenged in the extraordinary appeal by DCS and were binding on the court. Prior to the entry of a written order officially changing custody, however, Chancellor Evans "stayed" the "transfer" of Neveah pending an additional hearing on custody. His order noted that Chancellor Armstrong's hearing "was addressed by the Court as one of placement and not of legal custody." According to the GAL, DCS demanded an opportunity to put on new evidence, and after the additional evidentiary hearing, Chancellor Evans "overruled" his previous ruling "without cause" and accepted DCS's position regarding the conclusiveness of its order of guardianship.

We cannot fault Chancellor Evans for holding an additional evidentiary hearing to receive updated evidence in this case. In fact, it appears that the parties below may have agreed, although reluctantly, to such a procedure. At the beginning of the final

14

evidentiary hearing, counsel for Foster Parents explained to Chancellor Evans:

> So we came before you to argue our petition for custody, but at that point this child had been away from her home for almost a year. And so at that point, because we had to have an evidentiary hearing on the custody, we made the decision just to go forward with the adoption and try all of the issues at the same time. So that is procedurally why we have this custody issue that is still out there and how that came to be and why [] we are here on all of the petitions.

During closing arguments after the evidentiary hearing, counsel for Foster Parents continued:

> The only reason we are here now is because to avoid an appeal and to make sure that we had a full record where all the evidence was presented, all of the lawyers agreed -- and certainly correct me if I'm misstating what we all agreed to -- but the consensus was not to waste any more time in this child's life with legal maneuvers. Let's come down here and have a full blown evidentiary hearing on all the issues and let you hear the evidence and let you decide.

In a written motion filed during trial, Foster Parents explained that when DCS objected to Chancellor Evans's oral ruling that he would award custody to Foster Parents based on Chancellor Armstrong's previous findings, "in order to avoid another lengthy appeal, all parties agreed that the matter would be set for an evidentiary hearing along with the adoption petitions." The GAL likewise noted in his pretrial brief that his argument regarding Chancellor Armstrong's findings and res judicata "may not be dispositive at this juncture, as the parties are now willingly appearing to present testimony and argument [regarding] whether custody should be removed from [DCS] and awarded to [Foster Parents]."

In any event, this Court recognizes that Chancellor Armstrong clarified at the beginning of the 2014 evidentiary hearing that "[f]or the purposes of our hearing today, we're going to be talking about placement; . . . not the removal of legal custody of the Department[.]" We also recognize that additional evidence would be relevant to determine whether completely removing Neveah from the legal custody of DCS would serve her best interest. Moreover, the August 2014 hearing before Chancellor Armstrong was held many months prior to the first hearing before Chancellor Evans around May 2015. This Court has often recognized that "events and lives" do not stand still while custody disputes proceed through the courts. *See, e.g.*, *Crafton v. Roberts*, No. W2015-00048-COA-R3-CV, 2015 WL 9466011, at *8 (Tenn. Ct. App. Dec. 28, 2015) (quoting

15

*Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at \*4 (Tenn. Ct. App. July 21, 1999)) (instructing the trial court to "endeavor to ascertain and give effect to the parties' circumstances as they exist as of the date of the remand proceedings"). We reject the GAL's suggestion that Chancellor Evans was required to accept Chancellor Armstrong's findings regarding the issue of placement as binding the outcome on remand on the determination of *legal custody*.

### D.     The Order of Guardianship

The next issue raised by Foster Parents is whether the chancery court erred in awarding full guardianship to DCS ex parte and in failing to set it aside. A brief review of the basic timeline is helpful in analyzing this issue. The chancery court proceedings began with the filing of the termination petition by the GAL on April 23, 2014. Foster Parents filed their own petition to terminate parental rights and for adoption on May 15, 2014. After the adoption petition was filed, DCS removed Neveah from Foster Parents' foster home, and in August 2014, Chancellor Armstrong ordered that she be returned. This Court granted a stay of the trial court's order and ultimately reversed the order directing foster home placement of Neveah via an opinion issued on April 2, 2015. However, we noted that a trial court presiding over an adoption maintains the power to award legal custody of a child to pre-adoptive parents like Foster Parents. One week prior to the scheduled custody hearing on remand, Mother and DCS participated in surrender and guardianship proceedings before Chancellor Evans on May 11, 2015. The surrender proceeding took place under a separate docket number without notice to the GAL or Foster Parents. In that separate proceeding, DCS obtained an order of full guardianship over Neveah without informing Chancellor Evans of the pending matters under the separate docket number.[7] DCS then appeared at the custody hearing on remand in this case and insisted that its order of guardianship trumped all other orders and rendered the termination and adoption proceedings moot.

---

[7]During a later hearing, Chancellor Evans indicated his surprise when he learned that he was the judge who signed the surrender and guardianship order regarding Neveah:

> THE COURT: The department has made a whole lot of statements that are not supported in the record in this proceeding. And regarding the surrender that was made by the natural mother and the guardianship order that was referred to is not in this file, so there are a number of things that need to be confirmed, but in any –
>
> [Counsel for DCS]: Your Honor, those are maintained in a separate file, separate proceedings. I have a copy of the order and the surrender. Your Honor actually signed it.
>
> THE COURT: I signed it?
>
> [Counsel for DCS]: Yes, Your Honor.

16

DCS claims that it acted in accordance with governing statutes in all aspects of these proceedings. It also claims that it has an absolute right to veto an unwanted adoption due to its order of guardianship. The GAL and Foster Parents dispute that DCS acted lawfully in obtaining the order of guardianship. Resolving this disagreement requires a careful examination of the applicable statutes governing adoption and surrenders.

"In Tennessee, the adoption statutes are to be strictly construed since they are in derogation of the common law." *In re K.A.Y.*, 80 S.W.3d 19, 23 (Tenn. Ct. App. 2002) (citing *Johnson ex rel. Johnson v. Wilbourn*, 781 S.W.2d 857, 859 (Tenn. Ct. App. 1989)). Tennessee Code Annotated section 36-1-116 governs the filing of adoption petitions. *In re Neveah W.*, 470 S.W.3d at 816 n.11. At the time of the proceedings below, the adoption statute provided, in pertinent part:

(f)(1) Upon the filing of the [adoption] petition, *the court shall have exclusive jurisdiction of all matters pertaining to the child*, including the establishment of paternity of a child pursuant to chapter 2, part 3 of this title, except for allegations of delinquency, unruliness or truancy of the child pursuant to title 37; provided, that, unless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that the petitioners have physical custody of the child at the time of the filing of the petition, entry of the order of guardianship, or entry of the order of adoption, or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6).

(2) Except for proceedings concerning allegations of delinquency, unruliness, or truancy of the child under title 37, *any proceedings that may be pending seeking* the custody or *guardianship of the child* or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed, or where the petitioners meet the requirement of § 36-1-111(d)(6), *shall be suspended pending the court's orders in the adoption proceeding*, and jurisdiction of all other pending matters concerning the child and proceedings concerning establishment of the paternity of the child shall be transferred to and assumed by the adoption court; provided, that until the adoption court enters any orders affecting the child's custody or guardianship as permitted by this part, all prior parental or guardian

17

authority, prior court orders regarding custody or guardianship, or statutory authority concerning the child's status shall remain in effect.

Tenn. Code Ann. § 36-1-116(f) (emphasis added).[8]

Pursuant to the adoption statute, then, the chancery court obtained exclusive jurisdiction of all matters pertaining to Neveah upon the filing of Foster Parents' adoption petition in 2014, and any proceedings seeking guardianship of the child were to be suspended pending the court's orders in the adoption proceeding. *See, e.g., In re K.A.Y.*, 80 S.W.3d at 25 (explaining that an adoption petition "had priority over" another party's custody petition and therefore the trial court did not err in granting the adoption petition without deciding the suspended custody petition).

We now turn to the provisions of the surrender statute in order to determine whether it provides for a different result. A "surrender" by a parent is a document

---

[8]Effective July 1, 2016, shortly after the entry of the trial court's March 30, 2016 order, the statute was amended to include the following additional sentence in subsection (b) regarding the effect of the suspension:

> Actions suspended by this section, regardless of the stage of adjudication, shall not be heard until final adjudication of the action for termination of parental rights or adoption regarding the same child, even if such adjudication of the termination of parental rights or adoption will render the custody, guardianship, or visitation action moot.

Tenn. Code Ann. 36-1-116(f)(2); 2016 Pub.Acts, c. 919, § 19, eff. July 1, 2016. "When the legislature amends a statute, it presumably does so either to change the law or to clarify it." *State v. Odom*, 928 S.W.2d 18, 30 (Tenn. 1996). The legislature's addition in this case was clearly a clarification of the existing statute rather than a substantive change. The senate bill summary stated:

> Under present law, except for proceedings concerning allegations of delinquency, unruliness, or truancy of the child, any proceedings that may be pending seeking the custody or guardianship of the child or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed are suspended pending the court's orders in the adoption proceeding. This amendment adds that actions so suspended, regardless of the stage of adjudication, will not be heard until final adjudication of the action for termination of parental rights or adoption regarding the same child, even if such adjudication of the termination of parental rights or adoption will render the custody, guardianship, or visitation action moot.

(http://wapp.capitol.tn.gov/apps/Billinfo/default.aspx?BillNumber=SB1393&ga=109).

executed pursuant to Tennessee Code Annotated section 36-1-111 (or the law of another jurisdiction) by which the parent relinquishes all parental rights to a child to another person or agency for the purpose of making the child available for adoption. Tenn. Code Ann. § 36-1-102(49). The surrender statute, Tennessee Code Annotated section 36-1-111, is incredibly lengthy and complex, with the statutory text of subsections (a) to (z) spanning nineteen pages of the Tennessee Code. The surrender statute requires that surrenders be made in chambers and entered on a special docket for surrenders. Tenn. Code Ann. § 36-1-111(b), (p)(2)(A); *see also In re Angela E.*, 303 S.W.3d 240, 247 (Tenn. 2010) ("the [surrender] proceeding is judicial, [but] it occurs privately in the chambers of a judge"). Accordingly, "a surrender need not be filed in the same proceeding as the petition for adoption." *In re Baby*, 447 S.W.3d 807, 830 n.15 (Tenn. 2014).

A surrender executed in accordance with the statute has the effect of terminating all rights of the parent to the child. Tenn. Code Ann. § 36-1-111(r)(1)(A)(i). The surrender statute "anticipates . . . that the surrender of parental rights is made in favor of a specific other person or entity who must (or will soon) have physical custody of the child, and that the child will be made available for adoption." *In re Angela E.*, 303 S.W.3d at 247 (internal citations omitted). However, a surrender does not by itself establish guardianship or custody in the person or entity designated to receive the surrender:

> Unless prior court orders or statutory authorization establishes guardianship or custody in the person or entity to whom the surrender . . . is executed, the surrender . . . alone does not vest the person, persons or entities who or that receive it with the legal authority to have custody or guardianship or to make decisions for the child without the entry of an order of guardianship or partial guardianship as provided in subdivision (r)(6)(A) *or as provided in § 36-1-116(f)* [of the adoption statute]. The court accepting the surrender . . . shall not enter any orders relative to the guardianship or custody of a child for whom guardianship or custody is already established under prior court orders or statutory authorization, except upon motion under subdivision (r)(4)(D) by the person, persons or entities to whom the surrender or parental consent is executed.

Tenn. Code Ann. § 36-1-111(r)(2)(A) (emphasis added); *see also* Monica L. Allie, *The New Adoption Law in Tennessee: A Controversial Sweeping Reform*, 32 Tenn. B.J. 18 (Sept./Oct. 1996) ("the person receiving the surrender does not automatically obtain guardianship of the child but must be granted guardianship by specific court order").[9]

---

[9]To be clear, the parties to this appeal do not challenge the *surrender* of Mother's parental rights. Instead, they challenge the *order of guardianship* entered by the court after Mother's surrender.

The surrender statute goes on to address jurisdictional issues at length in subsection (r) as follows:

(3)(A) *Except as provided in subdivisions (r)(2) and (4), a validly executed surrender shall confer jurisdiction of all matters pertaining to the child upon the court where the surrender is executed or filed until the filing of the adoption petition, at which time jurisdiction of all matters pertaining to the child shall transfer to the court where the adoption petition is filed*; provided, that the jurisdiction of the juvenile court to adjudicate allegations concerning any delinquent, unruly, or truant acts of a child pursuant to title 37 shall not be suspended.

. . . .

(4)(A) When, at the time the surrender . . . is executed, a prior court order is in effect that asserts that court's jurisdiction over the child who is the subject of the surrender . . . , the prior court order shall remain effective until, and only as permitted by this section, an alternate disposition for the child is made by the court where the surrender is executed or filed or until, and only as permitted by this section, an alternate disposition is made for the child on the basis of a termination of parental rights proceeding, or, as permitted by § 36-1-116, until an alternate disposition for the child is made by the court where the adoption petition is filed.

. . . .

(C) If the court that has entered the prior custody order under subdivision (r)(4)(A) has subject matter jurisdiction to terminate parental or guardian rights at the time a surrender of the child who is the subject of that order is validly executed in another court pursuant to subdivision (r)(4)(D) or at the time a petition to terminate parental rights is filed pursuant to subdivision (r)(4)(E), it shall continue to have jurisdiction to complete any pending petitions to terminate parental or guardian rights that are filed prior to the execution of the surrender or prior to the filing of the petition to terminate parental rights in the other court pursuant to subdivision (r)(4)(E). *The court shall not have jurisdiction to complete any pending petitions to terminate parental rights subsequent to the filing of a petition for adoption.* The court may enter orders of guardianship pursuant to the termination of parental rights proceedings unless prior thereto an order of guardianship is entered by another court pursuant to subdivisions (r)(4)(D) and (E). Any orders of guardianship entered pursuant to subdivisions (r)(4)(D) and (E) or

pursuant to § 36-1-116 shall have priority over the orders of guardianship entered pursuant to this subdivision (r)(4)(C); provided, that orders terminating parental rights entered pursuant to this subdivision (r)(4)(C) shall be effective to terminate parental rights.

(D) *If the person, persons or entities in subdivision (r)(4)(B) to whom the surrender is made have legal and physical custody of the child or the right to legal and physical custody of the child pursuant to a prior court order at the time the surrender is executed to them, any court with jurisdiction to receive a surrender may receive a surrender that is executed to them and shall have jurisdiction, upon their motion, to enter an order giving guardianship or partial guardianship to the person, persons or entities*, and, notwithstanding subdivision (r)(4)(A), such order may make an alternate disposition for the child.

. . . .

(6)(A) Subject to the restrictions of subdivisions (r)(2) and (4), a validly executed surrender under this section . . . shall give to the person to whom the child is surrendered . . . standing to file a written motion for an express order of guardianship or partial guardianship, as defined in § 36-1-102, from the court where the child was surrendered or where, under subsection (q), the surrender was filed, or in the court that, pursuant to subdivision (r)(4)(A), has granted legal custody of the child to such person, or in the court in which the adoption petition is filed. *A validly executed surrender shall entitle the department or the licensed child-placing agency that received the surrender to have the court enter an order of guardianship pursuant to subdivision (r)(6)(C).*

. . . .

(C) *If* the person, *the department*, or the licensed child-placing agency *to whom the child is surrendered . . . has physical custody* or has otherwise complied with the requirements of subdivision (d)(6), *and if there has been full compliance with the other provisions of this section*, the court may, contemporaneously with the surrender or the filing of an adoption petition, immediately upon written motion by the person or the person's attorney, and *the court shall, if the surrender is to a licensed child-placing agency or the department, enter an order giving* the person, the licensed child-placing agency, or *the department, guardianship or partial guardianship of the child.*

21

Tenn. Code Ann. § 36-1-111(r) (emphasis added).

The jurisdictional provisions of the surrender statute are certainly not a model of clarity. We recognize that subsection (r)(4)(D) of the surrender statute, if read in isolation, would appear to allow any court that has jurisdiction to receive a surrender to also enter an order of guardianship to an entity receiving a surrender if that entity already has legal and physical custody of the child. However, we believe that a guardianship order pursuant to subsection (r)(4)(D) of the surrender statute cannot be entered when an adoption court has previously assumed exclusive jurisdiction and any guardianship actions were thereby suspended pursuant to section 36-1-116(f). We interpret subsection (r)(4)(D) of the surrender statute as authorizing the entry of a guardianship order only in the absence of a suspension due to a pending adoption petition. Likewise, we believe subsection (r)(6) of the surrender statute entitles DCS to obtain the entry of an order of guardianship only in the absence of any existing suspension of guardianship proceedings pursuant to the adoption statute. According to the adoption statute,

> *Except for proceedings concerning allegations of delinquency, unruliness, or truancy of the child under title 37,* **any** *proceedings that may be pending seeking* the custody or *guardianship of the child* or visitation with the child who is in the physical custody of the petitioners on the date the petition is filed, or where the petitioners meet the requirement of § 36-1-111(d)(6), *shall be suspended pending the court's orders in the adoption proceeding*[.]

Tenn. Code Ann. § 36-1-116(f)(2) (emphasis added). The adoption statute specifically exempts delinquency, unruliness, and truancy proceedings from the suspension, but it does not provide a similar exception for guardianship actions in the context of a surrender proceeding. The recent amendment makes clear that suspended guardianship proceedings "regardless of the stage of adjudication, shall not be heard until final adjudication of the action for . . . adoption regarding the same child, even if such adjudication of the . . . adoption will render the . . . guardianship . . . action moot."[10]

---

[10]One of the primary purposes of the adoption statutes is "to ensure, to the greatest extent possible, that . . . [t]he adoptive process protects the rights of all persons who are affected by that process[.]" Tenn. Code Ann. § 36-1-101(a)(4). We believe that our interpretation of the adoption statute is consistent with that stated purpose and permits the adoption court to make informed decisions regarding the child with notice to the interested parties in the adoption proceeding. As the facts of this case demonstrate, DCS's interpretation would arguably permit a court to enter an immediate order of guardianship in the context of a private surrender proceeding without notice to the parties in the adoption proceeding or the child's guardian ad litem and without hearing evidence regarding the child's best interest, while at the same time binding the hands of the adoption court if the newly appointed guardian does not consent to the adoption. Such an interpretation would not serve the stated purpose of protecting the rights of all persons involved in the adoptive process.

Tenn. Code Ann. § 36-1-116(f)(2); *see also* Dawn Coppock, *Coppock on Tennessee Adoption Law* 80 (2005) ("Pending proceedings seeking custody, guardianship or visitation . . . are suspended pending the court's orders in the adoption.").

Turning to the facts of the case before us, the chancery court had exclusive jurisdiction over all matters pertaining to the child due to the filing of the adoption petition in 2014. Pursuant to the adoption statute, 36-1-116(f), any separate proceedings seeking guardianship of the child should have been suspended pending the court's orders in the adoption proceeding and should not have been heard until final adjudication of the adoption action. The chancery court therefore was not authorized to enter the May 11, 2015 order awarding full guardianship of Neveah to DCS in the context of the surrender proceeding, and the chancery court should have granted Foster Parents' motion to set aside or vacate the order of guardianship.

The trial court did not discuss these statutes regarding jurisdiction and suspension of guardianship proceedings. It denied Foster Parents' motion to set aside or vacate the order of guardianship upon finding that "the order of full guardianship cannot be attacked more than thirty days after the entry of the order" pursuant to Tennessee Code Annotated section § 36-1-112(d). The referenced statute, entitled "Revocation of surrender and parental consent; form," provides:

> After the revocation period has expired or after the court has entered an order confirming a parental consent, no *surrender* or waiver of interest or parental consent shall be set aside by a court except upon clear and convincing evidence of duress, fraud, intentional misrepresentation or for invalidity under § 36-1-111(d), and no *surrender*, waiver of interest, or parental consent may be set aside for any reason under this part unless the action based on these grounds is initiated within thirty (30) days of the execution of the surrender, waiver of interest or within thirty (30) days of the date of entry of the order of confirmation of the parental consent.

Tenn. Code Ann. § 36-1-112(d) (emphasis added). By its terms, this statute applies to surrenders, not to orders of guardianship. The trial court erred in refusing to set aside the order of guardianship based on this statute.

The trial court also added that "the Guardian ad Litem and [Foster Parents] have no standing to challenge the order of full guardianship. *See Allen v. Wright*, 46[8] U.S. 737, 751 (1984) (a litigant is barred from raising another person's legal rights)." However, Foster Parents were not seeking to litigate another person's legal rights by filing the motion to set aside the order of guardianship. They were seeking to protect their own rights, as they had previously filed an adoption petition as prospective adoptive

23

parents and were denied the right to pursue that petition based on the entry of the order of guardianship. Courts use the doctrine of standing "to determine whether a party has a sufficiently personal stake in a matter at issue to warrant a judicial resolution of the dispute." *Metro. Gov't of Nashville v. Bd. of Zoning Appeals of Nashville*, 477 S.W.3d 750, 755 (Tenn. 2015). We conclude that Foster Parents had sufficient standing to challenge the order of guardianship.

For the aforementioned reasons, we hereby vacate and set aside the chancery court's May 11, 2015 order of guardianship.

### E. The petitions for Foster Parents to obtain custody and/or adopt

The trial court dismissed as moot the petition for custody to be removed from DCS and granted directly to Foster Parents due to the order awarding guardianship to DCS. The trial court also dismissed Foster Parents' petition for adoption, finding that "[t]he only way [Foster Parents] can adopt is if the Department's guardianship is terminated or the Department consents to them adopting Neveah, neither of which has occurred." Because we have set aside and vacated the order of guardianship, the dismissal of the custody petition and adoption petition on these bases is unwarranted.

The trial court also found, perhaps alternatively, that Foster Parents "do not have the right to custody of Neveah nor do they meet the requirements of T.C.A. § 36-1-111(d)(6) to receive custody of her, so they cannot prevail on their Adoption Petition." Tennessee Code Annotated section 36-1-115 addresses those eligible to file an adoption petition:

> The petitioners must have physical custody or must demonstrate to the court that they have the right to receive custody of the child sought to be adopted as provided in § 36-1-111(d)(6) *at the time the petition is filed*, unless they are filing an intervening petition seeking to adopt the child.

Tenn. Code Ann. § 36-1-115(b) (emphasis added). Foster Parents had physical custody of Neveah as her foster parents when they filed their petition for termination and for adoption in April 2014.

The concept of physical custody is synonymous with having physical possession of the child and does not require a court order or other judicial act. *In re Joseph F.*, 492 S.W.3d 690, 700 (Tenn. Ct. App. 2016). Physical custody can be granted by a parent, guardian, child-placing agency, or court. *Id.* at 701. Although the adoption statutes did not define "physical custody" at the time of the *Joseph F.* decision or the proceedings below, the legislature has since provided a statutory definition, effective July 1, 2016,

24

that is consistent with the common sense definition espoused in *Joseph F.* "Physical custody" is now statutorily defined as "physical possession and care of a child." Tenn. Code Ann. § 36-1-102(39). The statutory definition goes on to say:

> "Physical custody" may be constructive, as when a child is placed by agreement or court order with an agency, or purely physical, as when any family, including a formal or informal foster family, has possession and care of a child, so long as such possession was not secured through a criminal act. An agency and a family may have physical custody of the same child at the same time.

*Id.* Because Foster Parents had physical custody of Neveah "at the time the petition [was] filed," Tenn. Code Ann. § 36-1-115(b), as the adoption statute requires, Foster Parents had standing to file and pursue their adoption petition.

We discern no statutory requirement that petitioners must also maintain physical custody throughout the entirety of the adoption proceeding. The adoption statute provides:

> [U]nless a party has filed an intervening petition to an existing adoption petition concerning a child who is in the physical custody of the original petitioners, the court shall have no jurisdiction to issue any orders granting custody or guardianship of the child to the petitioners or to the intervening petitioners or granting an adoption of the child to the petitioners or to the intervening petitioners unless the petition affirmatively states, and the court finds in its order, that *the petitioners have physical custody of the child at the time of the filing of the petition*, entry of the order of guardianship, *or* entry of the order of adoption, or unless the petitioners otherwise meet the requirements of § 36-1-111(d)(6).

Tenn. Code Ann. § 36-1-116(f)(1) (emphasis added). Moreover, "standing is determined as of the date of the filing of the complaint[.]" *LaFollette Med. Ctr. v. City of LaFollette*, 115 S.W.3d 500, 504 (Tenn. Ct. App. 2003). Foster Parents had physical custody and standing at the time of filing of the adoption petition. DCS could not unilaterally defeat Foster Parents' standing to pursue their adoption petition simply by removing Neveah from their foster home.

For these reasons, the trial court's only stated reasons for denying or dismissing the pending petitions for Foster Parents to either obtain custody of Neveah or adopt her were erroneous and are hereby reversed.

### F.    Current Foster Mother

According to the original record transmitted to this Court, Current Foster Mother's participation in this case began on August 11, 2015, with her filing of an "Intervening Memorandum in Support of Motion to Dismiss Amended Petition for Injunctive Relief and for Custody of the Minor Child to be Awarded to [Foster Parents] Pursuant to Rule 12.02(6)," in which Current Foster Mother urged the trial court to grant a motion to dismiss that was previously filed by DCS.  Within the context of this memorandum in support of the motion to dismiss, Current Foster Mother also stated,

BACKGROUND

Subject to the Courts approval, [Current Foster Mother] respectfully asks this Court to allow her to intervene in the instant proceedings and as grounds for her request she provides the following background information. [Current Foster Mother] avers that she is the current foster mother through the Tennessee Department of Children's Services, for the above referenced child, that the child has resided in her home for more than twelve months (since June 25, 2014) and that it is her desire to adopt the child as evidenced by the Intervening Petition for Adoption filed by her on August 7, 2015.

The memorandum went on to address the merits of the motion to dismiss.  Current Foster Mother never filed a motion to intervene, and no order was entered allowing her to intervene.  No intervening petition for adoption appeared in the original record transmitted to this Court.  However, Current Foster Mother participated in the final hearing of this matter and was ultimately permitted to adopt Neveah.

After the GAL filed his notice of appeal to this Court on April 28, 2016, and the record was transmitted to this Court, the parties discovered that the record did not contain any adoption petition filed by Current Foster Mother.  On August 19, 2016, Current Foster Mother filed in the chancery court a "Motion to Correct the Record and to Allow [Current Foster Mother] to Intervene as a Petitioner Nunc Pro Tunc."  Current Foster Mother sought relief from the chancery court pursuant to Tennessee Rule of Civil Procedure 60.01 and Tennessee Rule of Appellate Procedure 24(e).  Current Foster Mother stated in the motion that she had filed her intervening petition for adoption with the chancery court clerk on August 7, 2015.  However, she admitted that "[n]o proper motion for leave to intervene was ever filed and no order granting leave to intervene was ever entered."  Current Foster Mother noted that she was allowed to participate as a party. She sought an order from the chancery court permitting her to intervene nunc pro tunc to August 7, 2015, and requested that her pleadings be added to the appellate record.

Foster Parents and the GAL filed separate responses to Current Foster Mother's motion, both asserting that the chancery court was without jurisdiction to hear a Rule 60 motion after the filing of a notice of appeal without first obtaining leave of the appellate court.

The chancery court held a hearing on the matter on September 2, 2016. During the hearing, the GAL and counsel for Foster Parents argued, again, that the chancery court had no jurisdiction to consider the motion due to the pending appeal. Both attorneys suggested that the proper procedure would be for Current Foster Mother to approach the appellate court and seek leave to address the trial court regarding the issue. Counsel for Current Foster Mother suggested that the trial court retained jurisdiction to correct errors or omissions in the record pursuant to Tennessee Rule of Appellate Procedure 24(e). She acknowledged, though, that she never filed a proper motion to intervene or obtained the entry of an order granting intervention in the original proceedings. The trial court granted Current Foster Mother's motion without elaboration. Before the hearing ended, the clerk of the court stated that she had researched the issue and determined that "there was an attempt to file." She explained that counsel for Current Foster Mother gave documents to the filing department, which were stamped, but the documents were subsequently "removed" by the filing department. Counsel for Current Foster Mother stated that she only learned of the problem with the documents after the notice of appeal was filed and she reviewed her records and determined that she "did not properly proceed in this matter" regarding the intervention.

On September 19, 2016, the chancery court entered an "Order Granting Petitioner, [Current Foster Mother's] Motion for Leave to Intervene Nunc Pro Tunc and Order to Supplement the Appellate Record." The order stated that the request for leave to intervene as a petitioner nunc pro tunc was well taken and granted "back to August 7, 2015." The court also found that the pleadings presented to and stamped by the clerk were "relevant to the issues in this matter and are properly includable in the record."

On appeal, Foster Parents assert that the trial court erred in granting Current Foster Mother leave to intervene retroactively and ordering pleadings that had been refused by the clerk of court to be included in the appellate record, all without permission from this Court.

"It should now be plain that once a party perfects an appeal from a trial court's final judgment, the trial court effectively loses its authority to act in the case without leave of the appellate court." *First Am. Trust Co. v. Franklin-Murray Dev. Co.,* 59 S.W.3d 135, 141 (Tenn. Ct. App. 2001). We must examine the rules invoked by the trial court and cited as the basis for providing relief to Current Foster Mother in order to

determine whether the trial court was authorized to provide the relief she requested during the pendency of this appeal.

Tennessee Rule of Civil Procedure 60.01 provides:

Clerical mistakes in judgments, orders or other parts of the record, and errors therein arising from oversight or omissions, may be corrected by the court at any time on its own initiative or on motion of any party and after such notice, if any, as the court orders. During the pendency of an appeal, such mistakes may be so corrected before the appeal is docketed in the appellate court, and thereafter *while the appeal is pending may be so corrected with leave of the appellate court*.

(Emphasis added.) Pursuant to Tennessee Rule of Appellate Procedure 5(c), for an appeal as of right, "[t]he clerk of the appellate court shall enter the appeal on the docket immediately upon receipt of the copy of the notice of appeal served upon the clerk of the appellate court by the trial court clerk[.]" Here, the appeal was docketed in this Court on May 6, 2016. Thereafter, leave of this Court was required before the trial court could take action pursuant to Tennessee Rule of Civil Procedure 60.01. However, no leave was sought or obtained in this matter prior to the chancery court's order of September 19, 2016.

In *Burke v. Huntsville NH Operations LLC*, 491 S.W.3d 683 (Tenn. Ct. App. 2015), this Court considered a similar attempt by a trial court to utilize Rule 60.01 to enter an order during the pendency of an appeal without leave of the appellate court. We explained that "the trial court was without authority to act once the notice of appeal was received and docketed by this Court unless the [litigant] sought and received leave from this Court." *Id.* at 692. We ultimately concluded that "absent a remand from this court, the trial court was without jurisdiction to act on the Tennessee Rule of Civil Procedure 60.01 motion while this appeal was pending." *Id.* at 684. We further held that the trial court's order granting relief pursuant to Rule 60.01 was void. *Id.* at 692.

For the same reasons, we conclude that Rule 60.01 did not authorize the trial court to enter the September 19, 2016 order while this appeal was pending without leave of the appellate court. We express no opinion as to whether Current Foster Mother would have been entitled to relief under Rule 60.01 if leave had been obtained from this Court. When an appellate court determines that a trial court lacked subject matter jurisdiction, it must vacate the order without reaching its merits. *See First Am. Trust Co.*, 59 S.W.3d at 141.

In this case, the trial court also cited Tennessee Rule of Appellate Procedure 24(e) as a basis for entering its order. Tennessee Rule of Appellate Procedure 24 governs the

28

content of the record on appeal. "The appellate record provides the boundaries of an appellate court's review." *State v. Smotherman*, 201 S.W.3d 657, 660 (Tenn. 2006). The record is to contain "copies, certified by the clerk of the trial court, of all papers filed in the trial court," with certain exceptions. Tenn. R. App. P. 24(a). Rule 24 further provides:

> (e) Correction or Modification of the Record. *If any matter properly includable is omitted from the record*, is improperly included, or is misstated therein, *the record may be corrected or modified to conform to the truth.* Any differences regarding whether the record accurately discloses what occurred in the trial court shall be submitted to and settled by the trial court regardless of whether the record has been transmitted to the appellate court. Absent extraordinary circumstances, the determination of the trial court is conclusive. If necessary, the appellate or trial court may direct that a supplemental record be certified and transmitted.
>
> . . . .
>
> (g) Limit on Authority to Add or Subtract From the Record. Nothing in this rule shall be construed as empowering the parties or any court to add to or subtract from the record except insofar as may be necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal.

(Emphasis added.) "Omissions, improper inclusions, and misstatements may be remedied at any time, either pursuant to stipulation of the parties or on the motion of a party or the motion of the trial or appellate court." Tenn. R. App. P. 24, Adv. Comm'n Cmt.

As subsection (g) indicates, "The trial court's authority to add to or subtract from the record is not unlimited." *State v. Housler*, 167 S.W.3d 294, 296 (Tenn. 2005). However, pursuant to subsection (e), "absent extraordinary circumstances, an appellate court does not have the authority to refuse to consider matters that are determined by the trial court judge to be appropriately includable in the record." *Id.* (quoting *Bradshaw v. Daniel*, 854 S.W.2d 865, 869 (Tenn. 1993)).

As for what is "properly includable," our supreme court has stated that "any matter that the trial court has *appropriately* considered is properly includable in the appellate record . . . when the matter is 'necessary to convey a fair, accurate and complete account of what transpired [in the trial court] with respect to those issues that are the bases of appeal.'" *Smotherman*, 201 S.W.3d at 661 (emphasis added) (quoting Tenn. R. App. P.

29

24(g)).

Applying these principles to the case at bar, it becomes clear that Rule 24(e) did not authorize the trial court to enter an order nunc pro tunc granting Current Foster Mother leave to intervene in the trial court proceedings when Current Foster Mother did not file a motion to intervene in the trial court, and the trial court made no ruling during the original proceedings regarding intervention. This was not a situation involving a matter that was "properly includable" being "omitted from the record," as addressed in Rule 24(e). The trial court's order granting leave to intervene nunc pro tunc does not convey an accurate account of "what transpired in the trial court." *See* Tenn. R. App. P. 24(g). "A nunc pro tunc entry is an entry made now of something which was actually previously done, to have effect as of the former date." *Cook v. Alley*, 419 S.W.3d 256, 261 (Tenn. Ct. App. 2013) (quoting *Cantrell v. Humana of Tenn., Inc.*, 617 S.W.2d 901, 902 (Tenn. Ct. App. 1981)). "Its office is not to supply omitted action by the court, but to supply an omission in the record of action really had where entry thereof was omitted through inadvertence or mistake." *Id.* A nunc pro tunc entry "may not be granted to relieve an attorney from the consequences of his own failure to comply with the rules, but only to correct mistakes or omissions arising from the actions of the court itself." *Dewees v. Sweeney*, 947 S.W.2d 861, 864 (Tenn. Ct. App. 1996). The portion of the trial court's order allowing Foster Mother to intervene nunc pro tunc under Rule 24(e) and/or Rule 60.01 is hereby vacated.

The second part of the trial court's September 19, 2016 order concerns the pleadings that Current Foster Mother attempted to file in the trial court. When ordering those pleadings to be added to the record on appeal, the trial court noted that the pleadings were presented to the court clerk, stamped as filed, and copies were provided to all of the lawyers. Even though the pleadings were not ultimately accepted by the clerk, the trial court ruled that these pleadings were "relevant to the issues in this matter and [] properly includable in the record" on appeal. The trial court ruled that the intervening adoption petition was "hereby supplemented into the appellate record." The supplemental appellate record contains the intervening petition for adoption with a stamp from the clerk's office containing the word "FILED," although the spaces underneath that would ordinarily contain handwriting indicating the time of filing and the person who filed the document are blank.

The Tennessee Supreme Court has upheld supplementation of the appellate record by the trial court under Rule 24 in several cases involving matters that were not properly introduced into evidence at trial but were for other reasons properly considered. *See, e.g.*, *Housler*, 167 S.W.3d at 298 (concerning a transcript of a separate trial used by both sides and the trial judge during trial and put before the court for consideration, although it was never admitted into evidence); *Johnson v. Hardin*, 926 S.W.2d 236 (Tenn. 1996)

(involving portions of a transcript attached to a motion for new trial in the technical record but not properly filed and certified as a transcript); *State v. Causby,* 706 S.W.2d 628, 633 (Tenn. 1986) (involving affidavits filed in support of a motion for new trial but not admitted into evidence).

Here, the trial court's final order referenced Current Foster Mother's intervening petition for adoption, and the court clearly considered it before ultimately granting the adoption by Current Foster Mother. Because of the deference we afford to a trial court's decision regarding the matters properly includable in the appellate record, *see Housler*, 167 S.W.3d at 296, we cannot say that the trial court erred in supplementing the appellate record with the pleadings that Current Foster Mother unsuccessfully attempted to file in the trial court in order to "convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal." *See* Tenn. R. App. P. 24(g). However, this conclusion regarding supplementation of the *appellate* record does not necessarily mean that it was proper for the trial court to ultimately *grant* Current Foster Mother's petition for adoption in the proceedings below. We now consider that issue.

Current Foster Mother basically participated in the trial below without filing a motion to intervene and without the entry of any order permitting her to intervene. "It is fundamental that '[a] person who is not a party of record to a lawsuit has no standing therein which enables him or her to take part in the proceedings.'" *City of New Johnsonville v. Handley*, No. M2003-00549-COA-R3-CV, 2005 WL 1981810, at *10 (Tenn. Ct. App. Aug. 16, 2005), *perm. app. denied* (Tenn. Feb. 6, 2006) (quoting *In re Estate of Reed*, No. W2003-00210-COA-R3-CV, 2004 WL 1488568 (Tenn. Ct. App. July 1, 2004)). Even if Current Foster Mother had filed a proper motion to intervene, which she did not, "a person does not automatically become a party to an action simply by filing a motion to intervene." *Carson v. Challenger Corp.*, No. W2006-00558-COA-R3-CV, 2007 WL 177575, at *4 (Tenn. Ct. App. Jan. 25, 2007). "When a person moves to intervene and the trial court never rules on the motion, the person is not a party and has no standing to participate in the proceedings, including on appeal." *Reynolds v. Tognetti*, No. W2010-00320-COA-R3-CV, 2011 WL 761525, at *7 (Tenn. Ct. App. Mar. 4, 2011) (citing *Carson*, 2007 WL 177575, at *4).

In *Boles v. Smith*, 37 Tenn. 105, 5 Sneed (TN) 105, 1857 WL 2560 (Tenn. 1857), the supreme court considered a case in which a nonparty took part in ejectment proceedings but was never made a party of record. The nonparty was a landlord who essentially presented his title papers and took over the presentation of a case even though his tenant was the named party. *Id.* at 106. The opposing party argued that because the landlord "in point of fact" was allowed to conduct the defense and avail himself of the advantages that he would have possessed if a formal party of record, he should not be

allowed to institute a second lawsuit against the opposing party. *Id.* at 107. The supreme court concluded that the landlord was not bound by the previous judgment because he was not a named party "in the legal sense of the term, and the fact that he officiously, or by the favor of the court, was permitted to interfere in conducting the [defense], does not affect the question; he had no legal right to do so." *Id.* at 107-108. *See also Carson*, 2007 WL 177575, at *3 (rejecting the contention that a person "effectively became a party" by filing a motion to intervene, filing another motion, and signing consent orders, when no order was entered allowing intervention); *Cowan v. Tipton*, 1 F.R.D. 694, 694 (E.D. Tenn. 1941) ("a person cannot become an intervening party on his own motion.").

With these principles in mind, we conclude that Current Foster Mother was not a party of record and had no standing to participate in the trial court proceedings. In fact, Current Foster Mother's status as a nonparty apparently led the clerk's office to remove or reject her pleadings. She was not an original party, she did not file a motion to intervene until after this appeal was filed, and the order purportedly granting intervention nunc pro tunc was improperly entered and has been vacated.[11] Because Current Foster Mother was not a party of record in the adoption proceeding, the trial court erred in granting her an adoption, and we hereby vacate the adoption order. *See, e.g., J.A.W. v. G.H.*, 72 So.3d 1254, 1257 (Ala. Ct. App. 2011) (holding that foster parents were not parties to a dependency proceeding even though their attorney filed a notice of appearance and they participated in the reunification process developed by the court, where no motion to intervene was filed and no order was entered making them parties, therefore the court's injunction against the foster parents was void); *B.V. v. Macon Cty. Dep't of Human Res.*, 14 So.3d 171, 175 (Ala. Ct. App. 2009) (affirming dismissal of a custody petition filed by foster parents in the context of a dependency proceeding because they were never granted permission to intervene and were "not parties in this case," so the trial court lacked jurisdiction to consider their custody petition even though they had filed other motions and participated in the proceeding for several years); *Boggs v. Com. ex rel. Boggs*, No. 2010-CA-001401-MR, 2012 WL 3236060, at *3-4 (Ky. Ct. App. Aug. 10, 2012), *appeal denied* (Ky. Feb. 13, 2013) (concluding that the state did not

---

[11]In *Lamar Advert. Co. v. By-Pass Partners*, 313 S.W.3d 779, 788 (Tenn. Ct. App. 2009), we construed a trial court's inartfully drawn order as implicitly granting a motion to intervene when a motion to intervene was actually filed, the issue was clearly put before the court, and the court's order did not explicitly state that intervention was granted but added the party's name to the style of the case and granted relief that the party sought. Considering those circumstances, we concluded that the court effectively and implicitly granted the motion to intervene. Here, however, Current Foster Mother conceded that she never filed a motion to intervene or obtained an order on intervention. We cannot conclude that the trial court implicitly granted a motion that was never filed. *See, e.g., Pfizer, Inc. v. Farr*, No. M2011-01359-COA-R10-CV, 2012 WL 2370619, at *8 (Tenn. Ct. App. June 22, 2012) ("As no motion to intervene was made, the trial court's ruling on a non-existent motion is, of course, a nullity.").

properly intervene in a post-divorce case prior to filing a motion to set child support, therefore it was not a party, its motion to set child support was ineffectual, and the child support order entered thereafter was void).

### G. *Disposition*

To briefly summarize, we have set aside and vacated the order of full guardianship to DCS, rejected the trial court's stated reasons for denying Foster Parents' petition for adoption and request for legal custody, and held that the trial court erred in granting Current Foster Mother an adoption because she was not a party of record. The remaining question is -- what proceedings should take place on remand? Before the final evidentiary hearing, the trial court ruled that he would hear proof on both of the competing petitions to adopt and "see where we go from there." Accordingly, both Foster Parents and Current Foster Mother were permitted to present their proof regarding their respective petitions. Foster Parents asked the court to either grant their adoption petition outright or alternatively award them custody and allow them to proceed with pursuing an adoption. The trial court denied Foster Parents' adoption petition and request for legal custody due to the existence of the order of guardianship and the lack of consent by DCS. As a result, the court made no findings regarding whether a change in legal custody or an adoption by Foster Parents would serve Neveah's best interest or whether Foster Parents otherwise met all of the other requirements for an adoption. We decline to make those determinations in the first instance and remand for the trial court to make those decisions. Recognizing, as we did above, that lives do not stand still during the appellate process, we expressly authorize the trial court to hold an additional hearing on remand if necessary. Nothing in this opinion should be construed as prohibiting Current Foster Mother from filing a proper motion to intervene in the proceedings on remand.

Appellate courts view the record and the proceedings in the trial court in a rather sterile vacuum, removed from the emotion that so often prevails in litigation. Despite this, the fact remains that everyone involved in this litigation has very strong feelings. This child happens to have two sets of foster caregivers who love her and want the best for her. We urge the parties to continue to have the best interest of this child as the focal point on remand, including the clear need for permanent resolution in the interest of the child's stability.

### IV. CONCLUSION

Any remaining issues are pretermitted. The decision of the chancery court is hereby affirmed in part, vacated in part, reversed in part, and remanded for further proceedings. Costs of this appeal are taxed to appellee, the Tennessee Department of Children's Services.

_____
BRANDON O. GIBSON, JUDGE