IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 10, 2021 Session

**DANIEL JEROME CANZONERI v. COLLEEN LUELLA BURNS**

**Appeal from the Chancery Court for Rutherford County**
**No. 15CV-509      Darrell Scarlett, Judge**
———————————————————

**No. M2020-01109-COA-R3-CV**
———————————————————

This case involves a petition to modify a permanent parenting plan for two minor children. The children's father filed the petition, alleging that there had been a material change of circumstances since the plan was entered and that, as a result, he should be designated as the children's primary residential parent. The children's mother denied that there had been a material change of circumstances and filed a counter-petition to modify the father's child support obligation. After a hearing on the parties' petitions, the trial court found that there had not been a material change of circumstances to justify modifying the plan. However, the trial court modified several aspects of the plan. The trial court further found that the father was voluntarily underemployed and that his child support obligation should be modified accordingly. Father appealed. We affirm the trial court in part, reverse in part, vacate in part, and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed
in Part, Reversed in Part, Vacated in Part, and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and KRISTI M. DAVIS, JJ., joined.

Christina Hammond Zettersten, Brentwood, Tennessee, for the appellant, Daniel Jerome Canzoneri.

Hunter Fowler and Clark Palombo, Murfreesboro, Tennessee, for the appellee, Colleen Luella Burns.

**OPINION**

**I.      FACTS & PROCEDURAL HISTORY**

Colleen Luella Burns ("Mother") and Daniel Jerome Canzoneri ("Father") are the biological parents of Roman, born June 2013, and Vincent, born April 2015 (collectively "the children"). On September 14, 2015, the trial court entered a permanent parenting plan pertaining to the children. On April 4, 2019, Father filed a petition to modify the plan, alleging that there had been a material change of circumstances since the plan was entered that justified a modification. On April 16, 2019, Mother filed a counter-petition to modify Father's child support obligation. The parties' countervailing petitions are the subject of this appeal.

Although Mother and Father were never married, initially, they resided together in Arizona. During their residency in Arizona, Roman was born. In 2014, Mother became pregnant, and she and Roman relocated to Tennessee. The parties agree that Mother and Roman's relocation was originally intended to be temporary. However, shortly thereafter, Mother and Father had a falling out, and their romantic relationship ended. As a result, Mother and Roman did not return to Arizona. In November 2014, Father relocated to Indiana. In April 2015, Vincent was born.

On August 26, 2015, the parties agreed to a permanent parenting plan for the children. Under the plan, Mother was designated as the children's primary residential parent and was awarded the majority of parenting time. Father was granted 120 days per year of parenting time with the children. Once Roman began preschool, Father's regularly-scheduled parenting time would take place over one three-day weekend per month. The parties also agreed that Father would be responsible for transportation so long as Mother resided in Rutherford County, Tennessee, or relocated closer to Father's residence. The parties agreed to joint decision-making on all major issues concerning the children's education, non-emergency healthcare, religious upbringing, and participation in extracurricular activities. For the purposes of child support, Father's income was set at $2,600.00 per month (approximately $15.00 per hour when working 40 hours per week), and he was obligated to pay Mother $630.00 per month.[1] On September 14, 2015, the trial court approved the parties' agreed permanent parenting plan.

The parties operated under the agreed permanent parenting plan for several years until an incident involving the children's stepfather prompted Father to petition for a change in the custody arrangement. On March 30, 2019—while Father was exercising parenting time with the children—Mother contacted Father and informed him of a recent domestic violence incident involving the children's stepfather. Although the children were not present during the incident, according to Mother, the stepfather threatened to harm the children. The stepfather was arrested for the incident, and Mother moved out of the

---

[1] Father's presumptive child support obligation equaled $780.00 per month. However, because Father was responsible for providing all visitation transportation, Mother agreed to a downward deviation of $150.00 per month.

residence. Concerned for the children's safety, Mother asked Father to retain custody of the children for an unspecified amount of time. Father agreed and temporarily retained custody of the children.

As a result of the domestic incident, on April 4, 2019, Father filed a petition to modify the permanent parenting plan and for an immediate *ex parte* restraining order. In his petition, Father alleged that there had been a material change of circumstances since the plan was entered that warranted modification. Specifically, Father alleged that, since the plan was entered, Mother had exhibited residential instability and that, as a result of the domestic incident, she did not have a suitable residence for the children. Father requested for the plan to be modified to designate him as the primary residential parent for the children. In his petition for an *ex parte* restraining order, Father alleged that, due to the domestic incident and Mother's residential instability, the children would be subject to a substantial risk of harm if they were to return to Mother's custody. Father requested that the trial court preclude Mother from removing the children from his custody until a final hearing could be held.

The trial court granted Father's petition for an *ex parte* restraining order and barred Mother from removing the children from Father's custody. A few weeks later, the trial court converted the restraining order into a temporary injunction. Shortly thereafter, Mother obtained a no contact order against the stepfather. Eventually, Mother obtained a full order of protection against the stepfather, barring him from contacting Mother or the children. After Mother obtained the full order of protection, the trial court determined that the children would no longer be subject to a risk of harm in Mother's custody. As a result, the trial court dissolved the temporary injunction that barred Mother from removing the children from Father's custody and ordered the parties to resume the parenting schedule under the parenting plan.[2]

On April 16, 2019, Mother answered Father's petition to modify the permanent parenting plan, denying that there had been a substantial and material change of circumstances. Mother also filed a counter-petition to modify Father's child support obligation. She alleged that, since the plan was entered, the parties' incomes had changed and that Father's child support obligation needed to be reevaluated.

On December 16, 2019, the trial court held a final hearing on the parties' countervailing petitions. Father and Mother each testified at the final hearing.

Father testified regarding the domestic incident involving Mother and the stepfather,

---

[2] On appeal, this Court determined that the record was incomplete because the trial court did not enter a written order to dissolve the temporary injunction. As a result, the Court directed the parties to supplement the record with an order by the trial court that dissolved the temporary injunction. On July 27, 2021, the trial court entered such an order, dissolving the temporary injunction *nunc pro tunc* May 6, 2019.

his recent interactions with Mother, and the children's educational progress and physical wellbeing. Father verified that Mother asked him to retain custody of the children after the domestic incident until it was safe for them to return to her care. He also admitted that Mother's response to the incident was appropriate.

A substantial portion of Father's testimony focused on his communication, or lack thereof, with Mother regarding the children. Father testified that he and Mother constantly disagreed on decisions such as the children's schooling and their dental care. For instance, at the time of trial, Roman was attending a private Christian school near Mother. Prior to Roman being enrolled in the school, Father repeatedly informed Mother that he did not want Roman to attend a private school. Despite Father's protests, Mother disregarded his input and enrolled Roman in kindergarten at the private school. After attending school for a year, the school informed Mother that Roman may need to repeat kindergarten. When Mother informed Father of Roman's educational status, Father stated that he wanted Roman to progress into first grade in a public school. Although the parties disagreed, Mother reenrolled Roman in kindergarten at the private school. Father testified that he was also displeased with the preschool that Vincent was attending. Records and reports from Vincent's preschool were admitted into evidence at the final hearing. The records and reports indicated that Vincent exhibited habitual behavioral issues at the preschool. Father testified that he was concerned with Vincent's disruptive behavior and the school's apparent inability to resolve the issue.

Father also testified on the parties' disagreement related to Roman's dental care. According to Father, Roman had serious dental issues, but he was not informed of the issues until it was discussed at a prior court hearing. After the hearing, Father took Roman to another dentist for a second opinion because he did not trust the diagnosis given by Mother's dentist. Specifically, Father believed Roman's dental needs were more severe than Mother's dentist stated. Eventually, Mother consented to Roman receiving dental treatment from the dentist that Father selected.

Father also testified on his income and Mother's recent residential history. Father testified that, in 2016, he began operating his own landscaping and lawn care business. He stated that in 2018, he earned a gross income of $32,000. Before Father started his own company, he earned approximately $720.00 per week, working 40 hours per week at $18.00 per hour. Father also testified that Mother has moved several times since the permanent parenting plan was entered and that she now lives farther away from his residence, outside of Rutherford County, Tennessee. Because Mother moved outside of Rutherford County, Father requested that the transportation provision in the plan be modified so that the parties would equally share transportation responsibilities.

Again, under the parties' permanent parenting plan, in addition to holidays and periods during school breaks, Father was permitted to exercise parenting time during one long weekend per month. However, at the time of trial, Father was not exercising parenting

- 4 -

time over these weekends. He testified that he did not exercise the time because the long drives from his residence to Mother's placed too great a strain on the children and that it drastically cut into the time that they could spend together. Despite his limited parenting time, Father testified that he and the children share a loving relationship. Although the parties constantly disagreed, Father admitted that Mother has performed the majority of the day-to-day parenting responsibilities and that she has done well in raising the children.

At the final hearing, Mother also testified on her communications with Father, the children's wellbeing, and her ability to care for the children. At the outset of her testimony, Mother addressed the domestic incident involving the children's stepfather. Mother stated that she has had minimal contact with the stepfather since the incident. She also testified that she filed for an uncontested divorce against the stepfather and that she does not intend to return to him. When questioned about her residential history, Mother stated that she temporarily resided with multiple friends after the domestic incident. However, by the end of summer 2019, she had retained a house for her and the children where she planned to reside permanently.

Mother verified that Roman attends a private Christian school and that, when Vincent reaches the suitable age, she would like for him to attend the same school. Mother testified that she constantly asked Father about the children's schooling but that he would always disagree with her suggestions without giving alternative solutions. However, she admitted that she believed, because she was the primary residential parent, she could make educational decisions without Father's input. Although Roman had previously struggled in school, Mother stated that he now receives tutoring and that his progress has improved. She testified that it was the school's decision for Roman to repeat kindergarten, but she agreed with the decision. Mother stated that Vincent recently began attending a different preschool and that he now receives more individual attention. His behavioral issues have been minimal since he began attending the new school.

Mother also testified on Roman's previous dental issues. She admitted that his back teeth had developed cavities, but she claimed that they were caused by Roman refusing to properly brush his teeth. She stated that Roman was on a waiting list for the dental work to be completed, but after she began arguing with Father about the issue, she permitted him to take Roman to another dentist.

As the primary residential parent, Mother stated that she has taken care of the children for their entire lives. She testified that she performs all of the essential child-rearing activities. Between 2015 and 2017, Mother worked at a variety of places, including a fast food restaurant, a casket sales company, and a carpet cleaning company. In 2017, Mother started her own cleaning services business. She stated that, through the cleaning business, she earns approximately $800.00 per week and is able to financially provide for herself and the children. She further stated that she increased her income by starting the cleaning business. Based on the positive relationship that she shares with the children,

Mother stated that she believed it is in the children's best interest to maintain the permanent parenting plan's parenting schedule.

Despite her previous disagreements with Father, Mother testified that she always encourages a positive relationship between Father and the children. She acknowledged that the children love Father and that they should spend time with him. However, Mother testified that during Father's parenting time with the children, there have been instances when he does not allow her to talk to the children on the phone. She stated that on previous occasions, including once on Vincent's birthday, she has gone several days without speaking with the children.

The trial court rendered an oral ruling on the parties' respective petitions at the conclusion of the final hearing. In its ruling, the trial court found that there had not been a material change of circumstances to justify changing the parenting schedule under the permanent parenting plan. The trial court also found that Father was voluntarily underemployed and that he was capable of earning a higher income than he was actually receiving. On July 24, 2020, the trial court entered a final written order that detailed its findings.

In its final order, the trial court specifically found that Mother's response to the incident involving the stepfather was appropriate. Additionally, the trial court stated that there was no evidence of a material change in circumstances that affected the children in a negative way to justify modifying the permanent parenting plan. Instead, the trial court found that Mother had provided adequate care as the primary residential parent. Having found that there had not been a material change in circumstances, the trial court stated that major decision-making authority regarding the children shall remain joint. However, the trial court went on to detail several modifications to the decision-making section of the parenting plan.

For the children's education, the trial court stated that the parties must mutually agree and, if they cannot agree, that the children shall attend a public school in the Mother's school zone. Additionally, the trial court stated that Mother shall have sole authority to decide whether Roman is to repeat kindergarten. As for the children's nonemergency healthcare, their religion, and their extracurricular activities, the court stated that each parent shall make these decisions "when the minor children are in their possession." The court ordered these modifications to the decision-making section of the plan despite neither party formally requesting for the modifications.[3]

---

[3] The parties' decision-making issues were extensively discussed at the final hearing, but were not mentioned in their pleadings. During arguments made by the parties' respective counsel, each asked the court to grant their clients decision-making authority. In his petition to modify the permanent parenting plan, Father did not request a change in the decision-making section of the plan. In his corresponding proposed plan, Father proposed that the parties retain joint decision-making authority. Additionally, other than her request to increase Father's child support obligation, Mother never petitioned to modify the plan.

To resolve the dispute on Mother's ability to contact the children when they are in Father's care, the trial court modified the plan by requiring phone calls with the children every Tuesday and Thursday at 7:00 PM. Further, because Mother moved farther away from Father since the entry of the original plan, the trial court modified the transportation provision. The trial court required the parties to share the transportation responsibilities by meeting at a location between their residences when they exchanged custody of the children.

The trial court also modified Father's child support obligation. First, the trial court noted that Father was not exercising his right to visit with the children during one long weekend per month. The court stated that Father would retain that visitation opportunity but that those visitation days shall be removed from Father's child support obligation. Consistent with its prior oral ruling, the trial court found that Father was voluntarily underemployed. The court explained that based on Father's education and work history and "inflation, wage increases, and a booming economy," Father had the ability to earn $800.00 per week (equaling $20.00 per hour for a 40-hour work week).[4] As a result, the trial court modified Father's child support obligation to $555.00 per month. The trial court also stated that the parties would be responsible for their respective attorney's fees.

Father timely appealed the trial court's decision.

## II.    ISSUES PRESENTED

Father raises several issues on appeal. However, we find that the relevant issues for the disposition of this Opinion are as follows:

1. Whether the trial court erred in finding that there was not a material change in circumstances;

2. Whether the trial court erred in modifying the permanent parenting plan after finding that there was not a material change of circumstances;

3. Whether the trial court erred in finding that Father was voluntarily underemployed; and

4. Whether Father is should be awarded attorney's fees under Tennessee Code Annotated section 36-5-103(c).

---

[4] Consistent with this finding, in the child support worksheet that was attached to the trial court's written order, Father's income was set at $3,466.67 per month. Meaning, for the purposes of child support, Father's income was increased by $866.67 per month.

For the following reasons, we affirm the trial court's decision in part, reverse in part, vacate in part, and remand.

### III.    STANDARD OF REVIEW

Previously, the Tennessee Supreme Court has stated the standard of review in cases involving a petition to modify a permanent parenting plan:

> In this non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. We review the trial court's resolution of questions of law de novo, with no presumption of correctness.
>
> A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings.
>
> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. Thus, determining the details of parenting plans is peculiarly within the broad discretion of the trial judge. It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court. A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice.

*Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013) (alterations and omission in original) (citations omitted and quotation marks omitted).

A trial court's decision to grant attorney's fees in a case involving child support or child custody is reviewed under an abuse of discretion standard. *Eberbach v. Eberbach*, 535 S.W.3d 467, 475 (Tenn. 2017).

### IV.    DISCUSSION

### A. Petition to Modify the Permanent Parenting Plan

We begin our discussion by addressing the trial court's decision to modify the parties' permanent parenting plan after finding that there had not been a material change of circumstances. When considering a petition to modify a permanent parenting plan, we must first determine if a material change in circumstances has occurred since the entry of the existing plan, and if it has, we then apply the "best interest" factors of Tennessee Code Annotated section 36-6-106(a). *C.W.H. v. L.A.S.*, 538 S.W.3d 488, 496 (Tenn. 2017) (citing *Armbrister*, 414 S.W.3d at 697). As stated in Tennessee Code Annotated section 36-6-101(a)(2)(B)(i), "[a] material change of circumstance does not require a showing of a substantial risk of harm to the child." There is no "bright line" test for determining whether a material change of circumstances has occurred. *McClain v. McClain*, 539 S.W.3d 170, 188 (Tenn. Ct. App. 2017). However, when considering a petition to modify a custody arrangement, the reviewing court should consider the following principles in making this determination:

> First, the change of circumstances must involve either the child's circumstances or a parent's circumstances that affect the child's well-being. Second, the changed circumstances must have arisen after the entry of the custody order sought to be modified. Third, the changed circumstances must not have been reasonably anticipated when the underlying decree was entered. Fourth, the change in circumstances must affect the child's well-being in some material way.

*Id.* (citations omitted) (quoting *Oliver v. Oliver*, No. M2002-02880-COA-R3-CV, 2004 WL 892536, at *3 (Tenn. Ct. App. Apr. 26, 2004)).

In the present case, Father sought to modify the parties' permanent parenting plan by requesting that the court designate him as the primary residential parent. Therefore, Father was seeking to modify the "custody" portion of the plan rather than the "residential parenting schedule." *See Armbrister*, 414 S.W.3d at 702-03; [5] *McClain v. McClain*, 539 S.W.3d at 187 (holding that because the mother was seeking to be designated as the primary residential parent, she petitioned for a modification of "custody"). In his proposed permanent parenting plan, Father suggested that the parties should maintain the joint decision-making duties for the children's education, nonemergency healthcare, religious upbringing, and extracurricular activities. Father argues that, since the entry of the permanent parenting plan, a material change in circumstances has occurred. Specifically,

---

[5] In *Armbrister*, the Tennessee Supreme Court explained that Tennessee Code Annotated section 36-6-101(a)(2)(B) applies for modification of a "prior decree pertaining to custody." *Id.* It further explained that section 36-6-101(a)(2)(B) contains "a different set of criteria for determining whether a material change in circumstances exists" than the criteria listed in section 36-1-101(a)(2)(C), which applies to a modification of a "residential parenting schedule." *Id.* at 703.

Father claims that the domestic incident involving the stepfather, Mother's change of residences after the incident, and her refusal to co-parent with Father exhibit a material change in circumstances. The trial court disagreed, stating that there was no material change of circumstances that justified changing the permanent parenting plan to designate Father as primary residential parent.

We agree with the trial court in that there was not a material change of circumstances in this case. While Father places significant weight on the domestic incident involving the stepfather, at trial, he admitted that Mother handled the incident in an appropriate manner by immediately contacting him to ensure that the children would not have any future contact with the stepfather. Factually, the scenario in this case is similar to the sequence of events in *Curtis v. Hill*, 215 S.W.3d 836 (Tenn. Ct. App. 2006).

In *Curtis*, upon the parents' divorce, the mother was designated as the primary residential parent of the minor children. *Id.* at 838. Five years later, the father filed a petition that alleged a material change of circumstances, seeking custody of the children. *Id.* At trial, the mother testified that, since the parties divorce, she remarried a man that was "very abusive" to her when the children were not present. *Id.* at 841. The mother further testified that she had the man arrested for abuse, that she divorced him, and that the children no longer had contact with the man. *Id.* Despite the mother's previous tumultuous relationship (along with other circumstances related to her care for the children), this Court found that there had not been a material change of circumstances to justify modifying the permanent parenting plan by designating the father as the primary residential parent. *Id.* at 842. This Court noted that the children were "generally healthy, well-adjusted, and doing well in school in the primary custody of [the mother]." *Id.* at 841.

Similar to the scenario in *Curtis*, in the present case, there is no evidence to indicate that the domestic incident involving the stepfather affected the well-being of the children. The children were not present during the incident, and the parties agree that Mother has provided adequate care for the children since the incident. After the incident, Mother obtained a full order of protection against the stepfather, protecting her and the children, and filed for divorce against the stepfather. Aside from the incident, since Mother enrolled Vincent in a smaller pre-school where he receives additional individual attention, his behavior has improved. Although Roman was previously struggling with certain subjects in school, Mother obtained tutoring for him and his progress has improved. Just as the children in *Curtis*, Roman and Vincent are "generally healthy, well-adjusted, and [are now] doing well in school in the primary custody of [Mother]." *Id.*

Further, Mother's change of residences, her change of employment, and her inability to co-parent with Father have not affected the well-being of the children in a way that justifies changing the designation of primary residential parent. Although the domestic incident caused Mother to change residences and temporarily reside with nearby friends,

she retained a new residence for her and the children only a few months after the incident.[6] Further, although Mother changed jobs several times after the parties' separation, she testified that she has been self-employed since 2017 and that her cleaning business has increased her income. The parties have each exhibited a clear inability or unwillingness to co-parent. In fact, the trial court specifically found that "the parties do not have the ability to agree on anything" and that each frequently refuses to consider the other's opinion on matters that concern the children. However, their unwillingness to effectively communicate with one another has not been shown, in this case, to have affected the well-being of the children. It is undisputed that both parents have a loving relationship with the children and that they spend quality time together when the children are in their physical custody.

In sum, there is no evidence to show that the domestic incident, Mother's change of residences, her change of employment, and the lack of communication between the parties has affected the children's well-being in a material way. Therefore, we affirm the trial court's ruling that there has not been a material change of circumstances to justify modifying the permanent parenting plan's designation of primary residential parent.[7]

Despite the trial court's finding that there had not been a material change of circumstances, it modified the permanent parenting plan in several ways. Under the original plan, the parties agreed to joint decision-making on issues concerning the children's education, their non-emergency healthcare, their religious upbringing, and their extracurricular activities. The trial court modified this section of the plan by granting Mother sole decision-making authority on whether Roman shall repeat kindergarten. The court also stated that each parent shall make decisions on the children's non-emergency healthcare, religious upbringing, and extracurricular activities "when the minor children are in their possession." Further, the court added mandatory biweekly telephone calls with the children. The trial court also modified the plan by requiring the parties to share the transportation responsibilities related to exchanging the children between visits. However, as we previously stated, modification of the transportation provision due to Mother changing residences was reasonably anticipated by the parties in the original plan.

---

[6] In the agreed permanent parenting plan, the transportation provision stated that Father would be responsible for providing transportation related to the parenting schedule "so long as the mother resides in Rutherford County or moves closer to father." As indicated in the wording for this provision, it appears that Mother relocating to another residence was reasonably anticipated by the parties. This indication provides further support for the conclusion that Mother's change of residences was not a *material* change of circumstances.

[7] In its final order, the trial court stated that a material change of circumstances must "adversely affect the minor children in a negative way" in order to modify a permanent parenting plan. In contrast, Tennessee Code Annotated section 36-6-101(a)(2)(B) states that "[a] material change of circumstance does not require a showing of a substantial risk of harm to the child." To the extent that the trial court required a showing of a substantial risk of harm to the children, we find such an error to be harmless because we affirm its finding that there was not a material change of circumstances to justify modifying the plan.

With the exception of the modification to the transportation provision, the trial court erred by making the previously-mentioned changes to the permanent parenting plan. "In the absence of proof of a material change in the child's circumstances, the trial court should simply decline to change custody." *McClain*, 539 S.W.3d at 189. Stated differently, "if [a material change in circumstances] has not occurred, then the parenting plan should not be changed *in any way*." *Cowan v. Hatmaker*, No. E2005-01433-COA-R3-CV, 2006 WL 521492, at *6 (Tenn. Ct. App. Mar. 3, 2006) (Susano, Jr., J., concurring); *see also Brunetz v. Brunetz*, 573 S.W.3d 173, 183-84 (Tenn. Ct. App. 2018) (stating that "[a] modification [of] decision-making authority is analyzed utilizing the same standards governing any modification of the parenting plan"). Despite this directive, the trial court modified the parties' permanent parenting plan by altering many of the decision-making directives under the plan and by requiring by-weekly phone calls with the children. Accordingly, having found that there was not a material change of circumstances to justify modifying the plan under Tennessee Code Annotated section 36-6-101(a)(2)(B), we reverse the trial court's decision to modify the decision-making provisions of the permanent parenting plan. For the same reasons, we also reverse the trial court's decision to require biweekly phone calls with the children.[8]

## B. Child Support Modification

Next, we shall address the trial court's decision to modify Father's child support obligation. "Determinations regarding child support are reviewed under an abuse of discretion standard." *State ex rel. Williams v. Woods*, 530 S.W.3d 129, 136 (Tenn. Ct. App. 2017). However, "decisions regarding child support must be made within the strictures of the Child Support Guidelines." *Id.* (quoting *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005)). "The Tennessee Child Support Guidelines presume that both parents contribute to the financial support of the child in pro rata proportion to the actual income available to each parent." *In re Samuel P.*, No. W2016-01665-COA-R3-JV, 2018 WL 1046784, at *12 (Tenn. Ct. App. Feb. 23, 2018) (citing Tenn. Comp. R. & Regs. 1240-02-04-.03(1)(a)). Meaning, "a parent's gross income will[,] [generally,] be equivalent to his or her . . . ability to support. However, certain situations may arise in which a court may 'impute' income to a parent." *Id.* (citation omitted) (citing *Massey v.*

---

[8] At the conclusion of the written order that modified the permanent parenting plan, the trial court stated that "[h]ad [it] found a material change of circumstances," it would not have found that it was in the best interest of the children to modify the plan. Although we do not reach a best interest determination in this appeal, we note that the trial court's "best interest finding" would not have been sufficient under Tennessee Rule of Civil Procedure 52.01. *See* Tenn. R. Civ. P. 52.01 (stating that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment"); *In re Makinna B.*, No. M2018-00979-COA-R3-JV, 2019 WL 2375434, at *5 (Tenn. Ct. App. June 5, 2019) (vacating a trial court order under Rule 52.01 due to the court's "lack of findings regarding the best interest of the child"); *In re Connor S.L.*, No. W2012-00587-COA-R3-JV, 2012 WL 5462839, at *4 (Tenn. Ct. App. Nov. 8, 2012) (stating that "[f]indings of fact are particularly important in cases involving the custody and parenting schedule of children").

*Casals*, 315 S.W.3d 788, 795 (Tenn. Ct. App. 2009)).

Under the Child Support Guidelines, a court "imputes" income to a parent when it "assign[s] or attribute[s] an income level to the parent that may not reflect the parent's actual gross income." *Massey*, 315 S.W.3d at 795. A court may impute gross income to a parent under three separate scenarios: (1) if the court determines that the parent is willfully underemployed or unemployed; (2) "[w]hen there is no reliable evidence of income due to [the] parent failing to participate in a child support proceeding or [by] failing to supply adequate and reliable financial information in a child support proceeding;" or (3) when the parent owns extensive non-income producing assets. Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(i). If a parent is found to be voluntarily underemployed, the trial court considers several factors to determine the amount of income to impute to the parent. *See id.* 1240-02-04-.04(3)(a)(2)(iv); *Smith v. Smith*, No. M2015-01038-COA-R3-CV, 2016 WL 3095067, at *4 (Tenn. Ct. App. May 24, 2016).

In the present case, under the original permanent parenting plan, Father was obligated to pay Mother $630.00 per month in child support, and his income was set at $2,600.00 per month (or $600.00 per week). In the trial court's final order, it found that Father was voluntarily underemployed and that he had the ability to earn $800 per week. The court made this determination based on Father's "education and background, and accounting for inflation, wage increases, and a booming economy in the time since his previous jobs." As a result, the trial court imputed Father's income at $800.00 per week and modified his child support obligation to $555.00 per month.[9]

We disagree with the trial court's reasoning that Father's "education and background, and accounting for inflation, wage increases, and a booming economy" was a sufficient basis to find that Father was voluntarily underemployed. The Child Support Guidelines list several factors for a court to consider when determining whether a parent is voluntarily underemployed. *See* Tenn. Comp. R. & Regs. 1240-02-04-.04(3)(a)(2)(iii).[10]

---

[9] Despite the trial court imputing Father's income, his total obligation was lowered because Mother's monthly income was raised from $1,865.07 under the original plan to $3,466.67 under the trial court's written order.

[10] Section 1240-02-04-.04(3)(a)(2)(iii) of the Child Support Guidelines lists the following factors for determining whether a parent is voluntarily underemployed or unemployed:

    (I)   The parent's past and present employment;

    (II)  The parent's education, training, and ability to work;

    (III) The State of Tennessee recognizes the role of a stay-at-home parent as an important and valuable factor in a child's life. In considering whether there should be any imputation of income to a stay-at-home parent, the tribunal shall consider:

        I.      Whether the parent acted in the role of full-time caretaker while the parents

- 13 -

Aside from passively referencing Father's "education and background," the trial court's order does not address the applicable factors. Additionally, its reference to "inflation, wage increases, and a booming economy," lacked an evidentiary foundation. After the parties separated in 2014, Father relocated from Arizona to Indiana. Although Father previously earned approximately $720.00 per week in Arizona, at the final hearing, neither party presented evidence on "inflation, wage increases, [or] a booming economy" in Indiana.

This Court has previously stated that, "calculating child support 'is much more difficult and much less precise when the [parent] is self-employed.'" *In re Samuel P.*, 2018 WL 1046784 at *14 (alteration in original) (quoting *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005)). "Where issues are raised about actual income from self-employment, information beyond pay stubs or individual tax returns may be needed." *Id.* (quoting *Eatherly v. Eatherly*, No. M2000-00886-COA-R3-CV, 2001 WL 468665, at *5 (Tenn. Ct. App. May 4, 2001)). "Determining income from self-employment may require 'scrutiny of various aspects of the parent's business.'" *Id.* (quoting *Eatherly*, 2001 WL 468665, at *6). When a parent is self-employed, his or her gross income "must be reduced by 'ordinary and reasonable expenses necessary to produce such income.'" *Radebaugh v. Radebaugh*, No. M2005-02727-COA-R3-CV, 2006 WL 3044155, at *10 (Tenn. Ct. App. Oct. 26, 2006) (quoting Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(3)(i)).

It is clear from the record that the trial court applied an incorrect legal standard in finding that Father was voluntarily underemployed. It did not consider the applicable

---

were living in the same household;

  II.  The length of time the parent staying at home has remained out of the workforce for this purpose; and

  III.  The age of the minor children.

(IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;

(V) The parent's role as caretaker of a handicapped or seriously ill child of that parent, or any other handicapped or seriously ill relative for whom that parent has assumed the role of caretaker which eliminates or substantially reduces the parent's ability to work outside the home, and the need of that parent to continue in that role in the future;

(VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future; and

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

guidelines for when a parent is self-employed, and it did not base its finding on the evidence that was presented at the final hearing. "Whether a[] [parent] is willfully and voluntarily underemployed is a question of fact, and the trial court has considerable discretion in its determination." *Eldridge v. Eldridge*, 137 S.W.3d 1, 21 (Tenn. Ct. App. 2002) (citing *Willis v. Willis*, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001)). However, "[a] finding of potential income must have an evidentiary basis." *In re Samuel P.*, 2018 WL 1046784, at *16 (quoting *Eatherly*, 2001 WL 468665, at *11). Therefore, we vacate the trial court's finding that Father is voluntarily underemployed and its decision to impute Father's income at $800.00 per week. Accordingly, we also vacate the trial court's decision to modify Father's child support obligation to $555.00 per month. *See Radebaugh*, 2006 WL 3044155, at *11-12 (vacating the trial court's child support award and remanding for further findings by the trial court after finding that the trial court's determination of the parent's self-employment income lacked an evidentiary basis).

We remand the case with instructions for the trial court to apply the correct legal standard in determining whether Father is voluntarily underemployed and, if he is found to be voluntarily underemployed, what amount to impute as his income.

### C.  Attorney's Fees

Father also argues that he should be awarded attorney's fees due to the trial court applying an incorrect legal standard in modifying the permanent parenting plan. Father argues that he is entitled to attorney's fees under Tennessee Code Annotated section 36-5-103(c).

Tennessee Code Annotated section 36-5-103(c) states that "[a] prevailing party may recover reasonable attorney's fees . . . from the non-prevailing party in any . . . proceeding to enforce, alter, change, or modify any decree of alimony, child support, or provision of a permanent parenting plan order." Stated differently, "[i]n child support modification cases, Tenn[essee] Code Ann[otated] § 36-5-103(c), gives trial courts the power to award 'reasonable attorney fees.'" *Massey*, 315 S.W.3d at 799 (quoting *Huntley v. Huntley*, 61 S.W.3d 329, 341 (Tenn. Ct. App. 2001)). Section 36-5-103(c) also "applies to awards of attorney['s] fees incurred on appeal." *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008).

In its final order, the trial court stated that each party shall be responsible for their respective attorney's fees. Although this Opinion reverses the trial court's order in part and vacates the order in part, we decline to disturb the trial court's decision on attorney's fees. Both parties have been partially successful in this appeal. Father's primary argument at trial and on appeal is that there has been a material change of circumstances since the permanent parenting plan was entered. As we have previously explained, we disagree with this conclusion and find that there has not been a material change of circumstances. In responding to Father's appeal, Mother asserts that the trial court correctly found that Father

is voluntarily underemployed. While we do not reach the substance of this issue, we vacate the trial court's holding that Father is voluntarily underemployed and the issue is remanded to the trial court. "Thus, [because] neither party is a clear winner" as the prevailing party, "we decline to find that the trial court abused its discretion" by stating the parties shall be responsible for his or her own attorney's fees incurred at trial. *See Richardson*, 189 S.W.3d at 729. Further, we decline to grant Father's request for attorney's fees incurred in bringing this appeal.

### *D. Disposition*

To summarize, the trial court erred in modifying the permanent parenting plan after finding that there had not been a material change in circumstances. It also applied an incorrect legal standard and rendered a decision that lacked an evidentiary foundation when it found that Father was voluntarily underemployed. Therefore, we reverse the trial court's decision to modify the education, non-emergency healthcare, religious upbringing, and extracurricular sections in the permanent parenting plan. We further reverse its decision to modify the plan by requiring the non-custodial parent to have biweekly telephone calls with the children. We vacate the trial court's finding that Father is voluntarily underemployed and its decision to modify his child support obligation and remand with instructions for the court to apply the correct legal standard in determining Father's child support obligation. In remanding the case, we recognize "that lives do not stand still during the appellate process," and therefore, "we expressly authorize the trial court to hold an additional hearing on remand if necessary." *See In re Neveah W.*, 525 S.W.3d 223, 252 (Tenn. Ct. App. 2017).

### V.    CONCLUSION

For the aforementioned reasons, the decision of the trial court is affirmed in part, reversed in part, vacated in part, and remanded. Costs of this appeal are taxed equally to appellant, Daniel Jerome Canzoneri, and appellee, Colleen Luella Burns, for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE